SOUTHERN NATURAL GAS COMPA-
NY, Plaintiff-Appellant
Cross-Appellee,

v.

PURSUE ENERGY, Defendant-Appellee
Cross-Appellant.

No. 84–4741.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1986.

Brunini, Grantham, Grower & Hewes, Walter S. Weems and John M. Grower, Jackson, Miss., for Southern Natural Gas Co.

Thomas, Price, Alston, Jones & Davis, Alex A. Alston, Jr. and Kenneth A. Rutherford, Jackson, Miss., for Pursue Energy.

Before THORNBERRY, RUBIN and JOLLY, Circuit Judges.

THORNBERRY, Circuit Judge:

This is a diversity case involving interpretation of a contract between Southern Natural Gas Co. (Southern) and Pursue Energy Corp. (Pursue). The United States District Court for the Southern District of Mississippi granted Pursue's motion for partial summary judgment on three issues and Southern's motion for partial summary judgment on two issues. Each party appeals the ruling against it. We reverse and remand for further proceedings.

## I. FACTS

Southern is an interstate pipeline company that purchases natural gas from producers, transports it, and sells it for resale to natural gas distribution companies. Pursue explores for and produces natural gas. In January 1980 Pursue and Southern entered into a contract under which Pursue would sell to Southern deep, high cost natural gas produced from the Thomasville Field in Rankin County, Mississippi. The contract was the result of extensive negotiations involving attorneys from both sides. Pursue began delivering gas to Southern in November 1980 and continues to do so today.

In the middle of 1981 a dispute arose over the price that Southern was to pay Pursue for the gas. Additional pricing disputes occurred in the following year. In June 1982 Southern filed suit in the Chancery Court of Hinds County, Mississippi, seeking a declaration that its interpretation of the contract was correct. Defendants in the suit were Pursue and 3300 Corp., which held an undivided interest with Pursue in the Thomasville Field gas and was selling to Southern under a contract virtually identical to the contract between Southern and Pursue.[1] 3300 Corp. removed the suit to federal district court.

---

1. The contract under which 3300 Corp. was selling to Southern was originally signed by South-

ern as buyer and Mississippi Mining and Minerals Company as seller. 3300 Corp. subsequently

Pursue and 3300 Corp. counterclaimed against Southern for breach of contract, seeking damages and interest. In 1983 Pursue and 3300 Corp. filed motions for partial summary judgment on the pricing issues. The district court granted these motions in October 1984. Southern appeals the judgment in favor of Pursue.[2] The parties filed cross-motions for partial summary judgment on two additional issues: the pressure at which the quantity of gas sold under the contract was to be measured, and the allocation between principal and interest of partial payments by Southern to Pursue and 3300 Corp. The district court granted Southern's motion, and Pursue cross-appeals from that judgment.

## II. THE MERITS

■ The interpretation of an unambiguous contract is a matter of law; the interpretation of an ambiguous contract through extrinsic evidence of the parties' intent is a matter of fact. *See Carpenters Amended & Restated Health Benefit Fund v. Holleman Construction Co.,* 751 F.2d 763, 766–67 (5th Cir.1985); *Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.,* 695 F.2d 991, 995–96 (5th Cir.1983). Thus, a district court may properly grant summary judgment when a contract is unambiguous, but may not grant summary judgment when a contract is am-

biguous and the parties' intent presents a genuine issue of material fact. *See Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 120 (5th Cir.1982); *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967). Under Mississippi law, the ambiguity of a contract is determined by examining the language of the instrument. *See Pfisterer v. Noble,* 320 So.2d 383, 384 (Miss.1975).[3]

■ In this case the district court determined that the contract between Southern and Pursue unambiguously resolved all of the issues presented by the respective motions for partial summary judgment. The district court's determination of non-ambiguity is a conclusion of law that we review *de novo. See Paragon,* 695 F.2d at 995; *Freeman,* 381 F.2d at 465; Fed.R.Civ.P. 52(a).

### A. *Southern's Appeal*

Southern argues that the district court erred in granting Pursue's summary judgment motion on the issues of price redetermination, reimbursement of severance taxes, and inclusion of severance tax reimbursement in the contract's price cap. On each issue Southern asserts that the contract either unambiguously favors its interpretation or is sufficiently ambiguous to

acquired a part of Mississippi Mining and Minerals Company's interest in the contract.

**2.** At the time Southern filed this appeal, no final judgment had been entered in the action between Southern and 3300 Corp.; 3300 Corp. was seeking punitive damages, and the district court had denied Southern's motion for summary judgment on that issue. 3300 Corp. subsequently dismissed its claim for punitive damages against Southern, and the district court entered judgment for 3300 Corp. in the amount of $4,404,103. Southern did not appeal that judgment.

**3.** The natural gas transactions with which we are concerned in this case are governed by Article 2 of the Mississippi Uniform Commercial Code. *See Piney Woods Country Life School v. Shell Oil Co.,* 726 F.2d 225, 231–32 (5th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985); Miss.Code Ann. § 75–2–107(1) (1972). Under the Mississippi U.C.C., *id.*

§ 75–2–202, the court may be able to consider course of dealing, usage of trade, and course of performance in determining whether the contract is ambiguous. *Cf. Paragon Resources, Inc. v. National Fuel Gas Distrib. Corp.,* 695 F.2d 991, 995–96 (5th Cir.1983) (construing New York U.C.C., court notes that question of ambiguity should be considered in light of course of dealing, usage of trade, and course of performance). *But cf. General Plumbing & Heating, Inc. v. American Air Filter Co.,* 696 F.2d 375, 378 (5th Cir.1983) (construing Mississippi U.C.C., court notes that trade usage and course of dealing "may be introduced only to clarify ambiguities in the written contract, not to contradict and alter the express contract provisions"). We need not surmise how a Mississippi court would decide this question, however, because the parties do not contend on appeal that course of dealing, usage of trade, or course of performance should be considered in determining whether the contract between Southern and Pursue is ambiguous.

warrant remand. We agree with Southern that the contract is ambiguous as to all three issues. Accordingly, we reverse the district court's grant of summary judgment and remand for trial.

### 1. *Price Redetermination*

Article 7, section 3(A) of the contract between Southern and Pursue states:

> If at any time the Commission, or any successor governmental authority, or the Congress of the United States, or any other regulatory or legislative body, does not have, or ceases to have jurisdiction or exercise control, over the prices charged for Residue Gas sold hereunder, the price to be charged for such gas shall be redetermined, *at Seller's election*, exercised by written notice given to Buyer during the first month of any calendar quarter starting January 1, April 1, July 1, and October 1 of each year (the first day of such quarter shall be the "quarterly price redetermination date"), effective as of the first day of such calendar quarter (or the cessation date if later) to be at Seller's election any one of the following.... (Emphasis added.)

The contract then lists three methods of setting the price for gas sold under the contract: section 3(A)(a) provides for a price per MMBTU equal to the higher of 10% above the last regulated price or 10% above the price for No. 2 fuel oil; section 3(A)(b) sets a base price of $3.60 per MMBTU escalating monthly; and section 3(A)(c) establishes a price equal to the average of the three highest prices paid or payable for gas in the same area, escalating monthly.

Pursue elected to redetermine the price at which it sold gas to Southern for the calendar quarters beginning October 1, 1980, January 1, 1981, and April 1, 1981.

Each time it chose the pricing option set out in section 3(A)(c). In mid-1981 the market price of gas began to fall. Pursue did not redetermine its price on July 1, 1981; instead, it notified Southern that it was exercising its contractual right *not* to redetermine, thus keeping the June 1981 price in effect. Southern took the position and maintains on this appeal that the contract requires Pursue to redetermine its price each quarter. Since July 1, 1981, Southern has paid Pursue a price each quarter equal to the average of the three highest prices paid or payable in the same area during the first month of that quarter, with escalation as provided in the contract.[4]

The district court found that the first sentence in Article 7, section 3(A) unambiguously gives Pursue the option to redetermine or not at the beginning of each quarter. Pursue offers two arguments to support this position.[5] First, it asserts that the phrase "at Seller's election" emphasized in the language quoted above modifies the word "redetermined," which immediately precedes it. Thus, Pursue contends, redetermination in any particular quarter is to be at the seller's—Pursue's—election. Second, Pursue notes that the contract provides for redetermination in "any calendar quarter ... of each year." According to Pursue, this language indicates that redetermination is optional with the seller; otherwise, the contract would provide for redetermination at the beginning of "every" or "each" calendar quarter.

Southern offers two textual arguments of its own to support its position that the contract requires Pursue to redetermine its price each quarter. First, it contends that the emphasized phrase "at Seller's election" refers to Pursue's initial choice, following deregulation, whether to continue

---

**4.** In April and May 1982 Southern also reimbursed Pursue for state severance taxes. Pursue contends that Southern should have reimbursed its severance tax payments each month. *See infra* subpart II(A)(2).

**5.** Both Pursue and Southern offer arguments in support of their interpretations that depend on

factual matters beyond the four corners of the contract. Under Mississippi law, we may not consider these arguments in determining whether the contract is ambiguous. *See Pfisterer v. Noble,* 320 So.2d 383, 384 (Miss.1975). On remand, of course, the parties are free to make these arguments before the district court.

the last regulated price or to switch to one of the pricing options specified in Article 7, section 3(A). According to Southern, the contract does not give Pursue the further choice whether to redetermine its price at the beginning of each quarter. Second, Southern notes that the price option provisions in section 3(A)(a) and 3(A)(c) refer to the "calendar quarter under consideration." This phrase suggests, according to Southern, that the parties intended redetermination to occur each calendar quarter.

After reading and re-reading the contractual provision at issue and carefully considering these arguments, we cannot say that the contract unambiguously favors either interpretation. Given the contract's murky language, both are plausible readings. Only extrinsic evidence of the parties' intent will reveal which is correct. Accordingly, we reverse the district court's partial summary judgment on this issue and remand for trial.

### 2. *Severance Tax Reimbursement*

Article 7, section 3(A)(c), the pricing option selected by Pursue, states that the seller shall receive a price equal to the three highest prices paid or payable in the same area, "plus reimbursement by Buyer to Seller of 100% of taxes to the extent that such reimbursement is not a part of such highest prices." Article 8, section 3 of the contract states:

> As provided in Article 7 hereof, Buyer agrees to reimburse Seller for one hundred percent (100%) of any taxes now and hereafter lawfully imposed upon and paid by Seller with respect to the Residue Gas delivered hereunder subject to the further provisions of this Article 8; provided however, in the event the price being paid for Residue Gas delivered and sold pursuant to this agreement is the price provided for in Article 7, Section 3A(a)(ii), then Buyer shall reimburse Sell-

er 100% of taxes as provided in this Article 8 if such taxes are being reimbursed pursuant to three (3) other contracts by pipeline purchasers, containing comparable terms and under comparable conditions, and for terms of at least two (2) years, for gas being sold from three different fields in Louisiana and Mississippi with at least one of such fields being in Mississippi.

Southern, relying on the proviso in Article 8, section 3, has refused to reimburse Pursue for severance taxes except during the months of April and May 1982. Southern takes the position that the proviso applies whenever the price it pays Pursue equals [6] the price established in Article 7, section 3(A)(a)(ii), regardless of which pricing option Pursue has selected. Pursue responds that the proviso applies only when the seller chooses the pricing option set out in Article 7, section 3(A)(a)(ii). If the seller chooses any other pricing option—as Pursue did—then the proviso does not apply, even though the price established by the chosen pricing option equals the price set by Article 7, section 3(A)(a)(ii).

We conclude that the contract language permits either interpretation but compels neither. In support of Pursue's position, Article 7, section 3(A)(c)—the pricing option selected by Pursue—clearly requires Southern to reimburse Pursue for 100% of taxes. The first portion of Article 8, section 3 merely reaffirms this obligation. The proviso in the second part of Article 8, section 3, according to Pursue's reading, states the conditions under which Southern must reimburse taxes if Pursue elects the pricing option in Article 7, section 3(A)(a)(ii). When Pursue chooses a pricing option other than Article 7, section 3(A)(a)(ii), as it did here, then the proviso in Article 8, section 3 has no effect.

---

**6.** Southern suggests in its brief that the proviso in Article 8, section 3 should apply whenever the price it pays Pursue equals *or exceeds* the price established in Article 7, section 3(A)(a)(ii). The language of the proviso unambiguously forbids this interpretation; the proviso applies only when the "price being paid for Residue Gas ... *is* the price provided for in Article 7, Section 3A(a)(ii)." (Emphasis added.) Although "is" might mean "equals" in this context, it cannot mean "equals or exceeds."

Southern's position also finds support in the contractual language. The first clause of Article 8, section 3 requires Southern to reimburse taxes "[a]s provided in Article 7" of the contract. Article 7, section 3(A) contains the pricing options; under each of these options except section 3(A)(a)(ii), Southern must reimburse taxes. Thus, the first clause of Article 8, section 3, by incorporating the provisions of Article 7, requires Southern to reimburse Pursue for taxes except when Pursue selects the pricing option in Article 7, section 3(A)(a)(ii).

The proviso in Article 8, section 3, according to this reading, creates an exception to Southern's obligation to reimburse taxes "[a]s provided in Article 7." The proviso applies only when "the price being paid ... is the price provided for in Article 7, Section 3A(a)(ii)." If the proviso came into play only when Pursue selected the pricing option in Article 7, section 3(A)(a)(ii), then it would have no effect at all; section 3(A)(a)(ii) does not require Southern to reimburse taxes under any circumstances. Nor, under this view, does the proviso itself require Southern to reimburse taxes under the Article 7, section 3(A)(a)(ii) pricing option if certain conditions are met, as Pursue contends. The proviso requires Southern to reimburse severance taxes only "as provided in this Article 8." Article 8, in turn, requires reimbursement of taxes "[a]s provided in Article 7." And Article 7, section 3(A) requires reimbursement under all pricing options *except* section 3(A)(a)(ii).

Because we find both of these readings plausible, we reverse the district court's grant of summary judgment and remand for trial. If on remand the factfinder concludes that Southern's reading of the contract is correct, then it will have to consider the further question whether the price paid by Pursue during the relevant period was "the price provided for in Article 7, Section 3(A)(a)(ii)."

### 3. *Price Cap*

Article 7, section 3(A)(c), the pricing option selected by Pursue, sets a price "equal to" the average of the three highest prices paid or payable in the same area, "plus reimbursement by Buyer to Seller of 100% of taxes to the extent that such reimbursement is not a part of such highest prices." Section 3(A)(c) also contains a price cap:

Any *price* redetermined pursuant to this sub-paragraph (c) shall never be more than the incremental pricing threshold level for high cost gas which may be prescribed by the Policy Act (or other legislation) above which Buyer would be required to incrementally price the gas for resale to its customers, such level presently being 130% of the average price per MMBTU for Fuel Oil No. 2 calculated as provided in Section 203 of the Policy Act and the rules and regulations of the Commission promulgated thereunder.... (Emphasis added.)

Pursue argues that the word "price" emphasized in the quoted language includes the "three highest prices" component of the compensation paid by Southern, but not the tax reimbursement component. Thus, the price cap takes effect only if the average of the three highest prices paid or payable in the same area exceeds the "incremental pricing threshold level for high cost gas." Southern contends that the word "price" includes both the "three highest prices" component and the tax reimbursement component. According to Southern, the price cap applies whenever the total compensation that it owes Pursue exceeds the incremental pricing threshold level. Since June 1982, Southern has employed its reading of the price cap provision to limit the amount that it pays Pursue.

The district court held that the contract unambiguously favors Pursue's reading. We do not find the language so pellucid. Both parties rely heavily on the words of the pricing formula set out in Article 7, section 3(A)(c). Southern notes that the provision sets a price "equal to" the three highest prices component "plus" the tax reimbursement component. Southern represents the provision as a mathematical formula: price = three highest prices + tax reimbursement. According to this in-

terpretation, "price" as used both in section 3(A)(c)'s pricing formula and in its price cap includes both the three highest prices component and the tax reimbursement component.

Pursue focuses its argument on the language of the tax reimbursement provision in section 3(A)(c)'s pricing formula.[7] It notes that the formula looks to the three highest prices paid or payable in the area "*plus* reimbursement by Buyer to Seller of 100% of taxes to the extent that such reimbursement is not a part of such highest prices." (Emphasis added.) The use of the word "plus" instead of "including," Pursue contends, evinces the parties' intent that tax reimbursement not be considered a part of the price. Pursue also notes that the pricing provisions in Article 7, sections 1, 2, and 3(A)(b) of the contract clearly do not treat tax reimbursement as a part of price.

■ We have carefully read the pricing formula and price cap provisions in Article 7, section 3(A)(c). Our reading convinces us that these provisions are ambiguous with respect to the price cap issue. We reverse the district court's grant of summary judgment in favor of Pursue and remand for trial.

## B. *Pursue's Cross-Appeal*

Pursue contends on cross-appeal that the district court erred in granting summary judgment in Southern's favor on two is-sues, the first concerning the proper air pressure at which to compute the MMBTU content of gas sold under the contract, and the second concerning the proper allocation of Southern's partial payments between principal and interest. We agree. As to the first issue, we reverse and remand for trial. As to the second, we reverse and render judgment in favor of Pursue.

### 1. *Air Pressure*

Southern pays under the contract according to the number of MMBTUs delivered by Pursue. The number of MMBTUs is calculated by multiplying the number of cubic feet of gas delivered (stated in thousands of cubic feet, or MCF) by the number of BTUs per MCF. The number of MCF and the number of BTUs per MCF will vary as the air pressure changes. Thus, the parties to a gas purchase contract usually agree to measure these quantities at a particular air pressure. In this case, Southern and Pursue agree that the contract requires the number of MCF to be calculated at 14.65 pounds per square inch absolute (psia).[8] They disagree, however, over whether the number of BTUs per MCF should be calculated at 14.65 psia or at 14.73 psia. Before February 1982, Southern calculated BTU content at 14.73 psia, as Pursue contends is proper. Since that time, however, Southern has calculated the number of MCF and the number of BTUs per MCF at the same air pressure.[9]

---

**7.** Pursue also notes that under section 203 of the Natural Gas Policy Act, 15 U.S.C. § 3343(a)(7), (b)(1) (1982), state severance taxes are excluded in calculating the "first sale acquisition cost" of natural gas. Pursue concludes that under Article 7, section 3(A)(c) of the contract, the "price ... calculated as provided in Section 203 of the Policy Act" does not include taxes. But the phrase "calculated as provided in Section 203 of the Policy Act" does not modify the "price" with which we are concerned. The phrase modifies the "price" that represents the incremental pricing threshold level for high cost gas, not the "price redetermined pursuant to this sub-paragraph (c)" to which the price cap applies. Thus, the definition of price in section 203 of the Policy Act provides no guidance in determining whether the parties intended the price cap to apply to tax reimbursement.

**8.** Exhibit A, section B(2) of the contract states:

> The unit of volume for all purposes of this agreement shall be 1,000 cubic feet of gas. A cubic foot of gas or Residue Gas shall be the amount necessary to fill a cubic foot of space when such gas is at a temperature of 60°F. and an absolute pressure of 14.65 pounds per square inch.

**9.** Since February 1982 Southern has calculated both the number of MCF and the number of BTUs per MCF at 14.73 psia. Southern now concedes that it should have calculated both quantities at 14.65 psia in light of Exhibit A, section B(2) of the contract, which expressly requires the amount of gas to be calculated at 14.65 psia. *See supra* note 8. Southern's error is without significance, however; the total number of MMBTUs will be the same regardless of the pressure at which the number of MCF and the number of BTUs per MCF are calculated, as long as the same pressure is used for both

As a result, Southern has paid Pursue less than Pursue claims it is owed.

Exhibit A, section A(2) of the contract states:

The BTU content shall be determined by a recording calorimeter installed by Buyer.... BTU values shall be corrected to 14.73 pounds per square inch absolute at 60°F. and saturated with water vapor; provided, however, with respect to Residue Gas delivered and sold hereunder pursuant to Article 7, Section 3, the BTU content shall be calculated at the actual water content of such gas.

Pursue contends that this provision squarely controls the issue. Although it acknowledges that measuring the number of MCF at 14.65 psia and the number of BTUs per MCF at 14.73 psia has the effect of "grossing up" the number of MMBTUs actually delivered, it asserts that this is what the parties bargained for.

Southern offers two principal arguments in response. First, it notes that Exhibit A, section A of the agreement concerns the quality of the gas delivered under the contract, not the quantity or price. The section is headed "Quality of Residue Gas, Processing." Section A(1) establishes various parameters for the gas delivered, including levels of "objectionable substances," sulphur, hydrogen sulphide, isopentane and heavier hydrocarbons, carbon dioxide, oxygen, and water. In addition, section A(1) requires that the gas have a temperature of "not more than 120°F." and a "gross heating value of not less than 950 BTU per cubic foot, measured at an absolute pressure of 14.73 pounds per square inch." Section A(2) then sets out the standards by which the gas will be measured to determine whether it falls within the parameters. The quoted passage from section A(2), according to this reading, establishes the standards for determining whether the gas has a "gross heating value of not less than 950 BTU per cubic foot." It has nothing to do with how the number of MMBTUs delivered is to be computed.

Second, Southern notes that Article 7 of the contract—the Article dealing with price—refers in several places to a price "per MMBTU" or for "each MMBTU" delivered under the contract. The parties, according to Southern, clearly intended that Southern would pay Pursue for the actual number of MMBTUs delivered, and not for a "grossed up" figure produced by using different pressures to calculate number of MCF and number of BTUs per MCF.

Both of Southern's arguments have weaknesses. Exhibit A, section A(1)(f) of the contract, which provides that gas must have a "gross heating value of not less than 950 BTU per cubic foot," requires that the determination be made at 14.73 psia. If Exhibit A, section A(2) were intended merely to set standards for making the determinations required by section A(1), there would be no need for it to repeat the 14.73 psia standard already established in section A(1)(f). Section A(2)'s restatement of the pressure figure suggests that the section does more than modify the requirements of section A(1).

Nor does the use of "per MMBTU" and "each MMBTU" in Article 7 of the contract necessarily indicate the parties' intent that the number of MCF and the number of BTUs per MCF be measured at the same pressure. The parties could have meant the pricing provisions in Article 7 to apply to each MMBTU as measured according to the terms of the contract. Indeed, this strikes us as the most plausible reading of the quoted language.

■ Although we find Southern's arguments less than compelling, we doubt that the parties intended for Southern to pay for more MMBTUs than it actually receives from Pursue. The language in Exhibit A, section A(2) of the contract is not so clearly applicable that it requires us to reach the counter-intuitive result urged by Pursue. Mindful that in interpreting a contract we should give it "a reasonable construction, where that is possible, rather than an un-

calculations. Thus, Southern has paid for the same number of MMBTUs making both calcula-

tions at 14.73 psia as it would have if it had made both calculations at 14.65 psia.

reasonable one," *Rubel v. Rubel,* 221 Miss. 848, 75 So.2d 59, 65 (1954), we reverse the district court's grant of summary judgment and remand for trial, at which extrinsic evidence of the parties' intent may be considered.

### 2. *Allocation of Partial Payments*

From 1980 until the present, Southern has paid Pursue each month the amount due under Southern's interpretation of the contract. If on remand the finder of fact decides any of the four issues discussed above against Southern, then the question of how to allocate Southern's partial payments between principal and interest will arise. Exhibit A, section C(1) of the contract provides that when Southern fails "to pay any amount when due, interest thereon shall accrue at a rate equal to 1% over the prime rate charged by the First National Bank of Dallas, Texas, for short term unsecured loans from the date when due until paid." Pursue seeks to allocate each of Southern's monthly payments first to interest due under Exhibit A, section C(1) for the previous month's underpayment, if any, and then to principal, including both unpaid principal from the previous month and principal for the current month. Southern contends that each of its monthly payments should be applied entirely to payment of the principal amount due that month. The district court granted summary judgment in favor of Southern.

At the heart of this issue is Miss.Code Ann. § 75–17–9 (1972), which states:

> When partial payments are made, the interest that has accrued to the time of payment, if any, shall be first paid, and the residue of such partial payment shall be placed to the payment of the principal.

Pursue contends that this statute controls the issue. The following hypothetical illustrates § 75–17–9's application to this case under Pursue's interpretation. Suppose that Southern owed Pursue $10,000 on Jan-

uary 25, but paid only $9,000, leaving a $1,000 shortfall for the month. Suppose further that by February 25, the next billing date, another $10,000 worth of gas had been delivered. At that point Southern would owe $10,000 (the price of the gas delivered) + $1,000 (the underpayment for the previous month) + X (interest on the $1,000 underpayment). If on February 25 Southern paid Pursue $10,000, that sum would represent a partial payment on Southern's total debt of $11,000 + X. Under the statute, Pursue would allocate the $10,000 first to X, the interest due, and then to the $11,000 principal. The unpaid principal would be carried forward to the next month, and so on.

Southern does not argue that the statute, by its literal terms, does not apply here. Instead, it makes several nontextual arguments. Its principal contention is that the statute preserves the debtor's common law right to direct the allocation of his payment between principal and interest. This argument rests on two premises: first, that at common law the debtor has the right to allocate his payments between principal and interest; and second, that § 75–17–9 did not abrogate the common law rule.[10] We find neither premise persuasive.

 In support of its position that at common law in Mississippi a debtor could direct the apportionment of partial payments between principal and interest, Southern cites *Williams v. Stockstill,* 224 Miss. 875, 82 So.2d 450 (1955) and *Aaronson v. McGowan,* 181 Miss. 642, 180 So. 738 (1938). But neither of these cases involved a debtor directing his payments between principal and interest; in each case the debtor owed money on two or more different debts and was permitted to direct his partial payment to one item of indebtedness rather than another. We have found no Mississippi case that recognizes a debt-

---

**10.** If Southern's argument were correct, it would still have to prove that it in fact directed its payments to principal rather than interest. Because we find Southern's argument meritless, we need not consider whether its direction of payments presents a genuine issue of material fact.

or's common law right to direct his payments between principal and interest.[11]

 Even if the debtor had such a right at common law, however, that right has been abrogated by § 75–17–9. Mississippi has abolished the rule that statutes in derogation of the common law are to be strictly construed. *See McCluskey v. Thompson,* 363 So.2d 256, 261–64 (Miss.1978) (en banc). The *McCluskey* court held that statutes must be "received . . . into the body of the law, not only as a rule to be applied, but as a principle from which to reason, and . . . common law on the same subject must give way to statutes." *Id.* at 264. Section 75–17–9 provides that partial payments "shall" be applied first to interest and then to principal. We must apply § 75–17–9 as it is written.

Southern attempts to avoid the statute's effect and bring itself within the rule of *Williams* and *Aaronson* by characterizing each of its monthly payments to Pursue as a separate debt. According to this theory, Southern was free to direct its monthly payment to the principal due that month, rather than to the principal and interest due from previous months. But even if Southern is correct in characterizing its monthly payments as separate debts—a

proposition about which we have doubts[12]—its argument must fail under *Freeman v. Truitt,* 238 Miss. 623, 119 So.2d 765 (1960). In *Freeman,* a debtor had promised to make a series of installment payments on a note. He defaulted on some of the payments. Although the court found that each of the installments represented a separate debt for statute of limitations purposes, it held under the predecessor to § 75–17–9 that the debtor's partial payments should be applied "first, to the payment of the interest accrued on the indebtedness to the date of receipt of such partial payment, and the residue of such partial payment should [be] applied to the payment of the oldest unpaid installments of the indebtedness." *Id.* at 771. *Freeman* makes clear that § 75–17–9 applies to partial periodic payments under a single contract, even if the payments are regarded as separate debts.

 We hold under § 75–17–9 that Southern's partial payments, if any, should be applied first to the interest accrued on Southern's indebtedness to the date the partial payment was received, and then to the principal amount owing on the debt. In reversing the district court's grant of summary judgment and rendering judgment

---

11. We note that under the "United States Rule," which states the federal common law,

> The creditor shall calculate interest whenever a payment is made. To this interest the payment is first to be applied; and if it exceeds the interest due, the balance is to be applied to diminish the principal. If the payment falls short of the interest, the balance of interest is not to be added to the principal so as to produce interest.

*Story v. Livingston,* 38 U.S. (13 Pet.) 357, 371, 10 L.Ed. 200 (1839), *quoted in Nat G. Harrison Overseas Corp. v. American Barge Sun Coaster,* 475 F.2d 504, 507 (5th Cir.1973); *see Devex Corp. v. General Motors Corp.,* 749 F.2d 1020, 1024 & n. 6 (3d Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985). The United States Rule applies in the absence of "a clearly expressed intention" by the parties to allocate payments in some other way. *Sun Coaster,* 475 F.2d at 507; *Devex,* 749 F.2d at 1025. The Rule does not permit the debtor unilaterally to allocate payments to principal rather than interest.

Although the United States Rule does not apply in this diversity case, it suggests, in the absence of Mississippi cases to the contrary, that at common law Southern would not have been able to direct its payments to principal absent a "clearly expressed" agreement with Pursue to that effect.

12. Under Mississippi law, the issue of whether a contract is severable is "one of intention, to be determined from the language which the parties have used and the subject matter of the agreement." *Mariana v. Hennington,* 229 Miss. 212, 90 So.2d 356, 364 (1956); *cf.* Miss.Code Ann. § 75–2–612(1) (1972) (defining "installment contract" as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted"). The contract between Southern and Pursue calls for Pursue to deliver a continuous stream of gas into Southern's pipeline system. See, for example, Article 4 of the contract. This suggests that the parties viewed the contract as creating a single debt payable in monthly increments. We need not decide this question, however, in light of our conclusion that § 75–17–9 applies to separate debts arising from a single contract.

for Pursue on this issue, we are cognizant of the principle that "when there is no clear state authority, the opinion of a district judge sitting in his own state is entitled to great weight on appeal." *Mozingo v. Correct Manufacturing Co.*, 752 F.2d 168, 176 (5th Cir.1985); *see Acree v. Shell Oil Co.*, 721 F.2d 524, 525 (5th Cir.1983). Here, however, the statutory and case law of Mississippi is clear, and we conclude that the district court erred in interpreting that law.

### III. CONCLUSION

We reverse the district court's grant of summary judgment and remand for trial on the four issues of contract interpretation that we have considered. We reverse the district court's grant of summary judgment on the allocation of payments issue and render judgment for Pursue. If at trial judgment is for Pursue on any of the contract interpretation issues, then the district court should apply Miss.Code Ann. § 75–17–9 in determining the proper allocation of Southern's partial payments between interest and principal.

REVERSED and REMANDED.