517 So.2d 303 (1987)
Garland P. AYCOCK Jr., D.D.S., and Mary Folse Aycock
v.
ALLIED ENTERPRISES, INC., James E. Gueydan, Director, Dr. Ray Cinnater, Director, James Buquet, Jr., Director, Dr. Sidney Warren, Jr., Director and Louis Gueniot, Director.
Dr. and Mrs. Anthony HERQUES
v.
ALLIED ENTERPRISES, INC., James E. Gueydan, Director, Dr. Ray Cinnater, Director, James Buquet, Jr., Director, Dr. Sidney Warren, Jr., Director and Louis Gueniot, Director.
Nos. CA 86 1424, CA 86 1425.
Court of Appeal of Louisiana, First Circuit.
November 10, 1987.
Writs Denied January 15, 1988.
*304 Joel A. Mendler, New Orleans, for defendant and appellantHouma Medical and Surgical Clinic.
Grady C. Weeks, Houma, for plaintiffs and appelleesDr. and Mrs. Garland P. Aycock, Jr., D.D.S.
*305 Maureen O'Connor Sullivan, New Orleans, for plaintiffs and appelleesDr. and Mrs. Anthony Herques.
Before LANIER, CRAIN and LeBLANC, JJ.
LANIER, Judge.
This is a suit in contract by two stockholders in a domestic corporation which seeks an interpretation of a stock buy-sell agreement between the corporate stockholders and the corporation. The two stockholders, Drs. Garland Aycock and Anthony Herques,[1] contended they were entitled to receive $8.87 per share for their stock under the terms of the contract. The corporation filed a reconventional demand against the two shareholders seeking enforcement of the contract at the price of $1.00 per share. The trial court accepted the contract interpretation sought by the plaintiffs and rendered judgment in favor of Dr. Herques for $300,559, and in favor of Dr. Aycock[2] for $482,808.37.[3] This suspensive appeal followed.

FACTS
In 1966, a group of doctors formed a corporation for the purpose of constructing and maintaining a building to house a clinic.[4] This corporation was originally named Allied Properties, Inc. The doctors also organized other corporations. Allied Equipment Company was formed to purchase equipment and lease it to the clinic. Apothecary, Inc. was formed to operate a pharmacy. Credit Collection Adjustment Agency, Inc. was formed to collect the clinic's accounts receivable.
Only the partners in the clinic were allowed to be shareholders in these corporations. In 1969, the shareholders of Allied Properties, Inc. executed a buy-sell agreement governing the transfer of the corporation's shares. This agreement granted Allied Properties, Inc. the option to repurchase the stock of those doctors who might leave the partnership at the "greater of the true value of the shares, or the sum of One Thousand Two Hundred ($1,200.00) Dollars per share." This agreement defined "true value" as follows:
For purposes of the foregoing, the term "true value" means the value of the stock as determined by a panel of three (3) persons, one of whom shall be appointed by the Board of Directors of the corporation, one by the shareholder (or, in the event of death, his heirs, executor or administrator, as the case may be) and the third appointed by the two (2) persons so selected, provided, however, that as to stock offered to the corporation pursuant to Article II foregoing, in no event shall the true value of the said stock be less than any bona fide offer to purchase made in good faith by a third party to the shareholder desiring to sell his said stock.
In 1973, this agreement was amended to redefine "true value" as follows:
"`True Value' means that certain result obtained by solving the following equation:
(A + X) - L ÷ S × .575 = True Value per share when:
A = all assets (other than land and improvements) of Allied as shown on the Balance Sheet of Allied;

*306 X = the sum of $2 million (being the appraised value of Land and Improvements owned by Allied as reflected on that certain appraisal prepared by Max J. Derbes, dated January 10, 1973);
L = all liabilities of Allied, fixed and/or contingent, as shown on the Balance Sheet of Allied;
S = the number of outstanding shares of Allied.
"For purposes of this paragraph, Balance Sheet means Allied's Balance Sheet prepared by Allied's accountants, utilizing the usual, and acceptable, accounting procedures, consistently applied, as at the close of Allied's fiscal year next preceding the date on which Allied's right to acquire shares hereunder comes into existence.
"In order to fairly reflect the value of Land and Improvements (represented by "X" in the foregoing equation), Allied agrees that on or before January 15, 1978, and at each subsequent 5-year period thereafter, it shall cause the Land and Improvements owned by Allied to be reappraised by a qualified land appraiser, and upon such appraisal being approved by Allied's Board of Directors, the value of such Land and Improvements, as reflected on such appraisal, shall be substituted for the sum of $2 million as the value of "X" in the said equation, provided that should Allied acquire or dispose of any land or improvements, or either or both, after the effective date of this Amendment and prior to the approval by Allied's Board of Directors, of any subsequent appraisal referred to herein, such appraisal (and the value assigned to "X" in the foregoing equation) shall be supplemented or reduced by the value of such acquisition or disposition, as the case may be; such value shall be initially determined by Allied's accountants, and shall thereafter be confirmed or revised by Allied's Board of Directors, which action shall be conclusive as to such value."
In 1974, due to poor management and the unsound financial condition of the four corporations, a decision was made to merge Allied Properties, Inc., the Apothecary, Inc., Credit Collection Adjustment Agency, Inc. and Allied Equipment Company into one corporation, Allied Enterprises, Inc. (Allied). In May of 1974, Allied was incorporated in preparation for the merger. After the meeting of November 26, 1974,[5] the doctors exchanged their shares in the four smaller corporations for shares in Allied, pursuant to approved exchange ratios.
A new buy-sell agreement was executed for Allied stock. This agreement was essentially the same as the prior agreements of Allied Properties, Inc., with the exception of Section IV. Instead of providing a "true value" formula, Section IV of the new buy-sell agreement provides, in pertinent part, as follows:
All shares required to be acquired by Allied pursuant to Article I and Article II hereof, or as to which Allied has a prior option to purchase, pursuant to Article III hereof, shall, when or if so acquired, as the case may be, be so acquired at and in accordance with the following:
A. From the effective date of this agreement through and including all stock purchased or to be purchased by Allied through the month of January, 1976, the price to be paid by Allied per share of such stock shall be $1.00.
B. Subsequent to the month of January, 1976, stock to be purchased by Allied pursuant to this agreement shall be so purchased by Allied at a price to be fixed and determined by the Board of Directors of Allied, in accordance with the following schedule:
1. On or before 77 days after the end of Allied's fiscal year, commencing with the 1975-end of Allied's fiscal year, Allied's accountants shall present Allied's annual balance sheet and annual profit and loss statement ("the Allied financials") to Allied's Board of Directors.
2. Within 30 days after the date of receipt by Allied's Board of Directors of Allied's financials, the Board of Directors *307 of Allied will meet and determine the price per share for the purchase and resale of Allied's stock. This determination shall be made on the basis of the Allied financials for the preceding fiscal year. In making such determination, the Directors will consult with Allied's accountants, and, utilizing generally acceptable business and accounting principles applicable to businesses such as the business of Allied, consistently applied, the Directors shall make the determination required by this Subparagraph, and shall include in the minutes of their meeting a declaration, signed by all Directors present thereat, as follows:
"The value of the stock of Allied Enterprises, Inc., for the period July 1, 19__, through June 30, 19__, for the purpose of that certain stock purchase agreement dated the ___ day of ___, 19__, shall be the sum of $____ per share."
Notwithstanding anything otherwise contained herein, the price per share, as contemplated by this agreement, shall never be less than $1.00 per share.
Drs. Aycock and Herques resigned from the partnership in February of 1982. Pursuant to the buy-sell agreement, they tendered their shares for purchase by the corporation in January of 1983. Dr. Aycock was the owner of 45,559 shares of stock, and Dr. Herques owned 33,885 shares. The purchase price of these shares had been set at $1.00 per share at the June 30, 1982 annual Board of Directors meeting of Allied. In setting the price, the Board of Directors did not include the appraised value of Allied's greatest assets, the clinic building and the equipment therein. Rather, the Directors set the price based on Allied's preceding fiscal year balance sheet and its profit and loss statement. The clinic building and the equipment were represented on the balance sheet as a capitalized long term lease, rather than at appraised value. The plaintiffs refused to accept the proposed purchase price, and each filed suit. Made defendants in both suits were Allied and its Board of Directors.[6]

PURCHASE PRICE UNDER BUY-SELL AGREEMENT

(Assignments of Error Numbers 1, 3, 4, 5, 6, 7, 8, 9, 10, 12, and 16)
Allied alleges the district court erred in interpreting the buy-sell agreement and setting the purchase price thereunder at $8.87 per share.
The trial judge summarized the basic arguments of the parties in his reasons for judgment and concluded, in pertinent part, as follows:
Plaintiffs maintain that the stock valuation must include the valuation of the underlying assets. They allege that the corporation is a real estate holding company. They also claim that generally accepted business and accounting principles require the inclusion of asset valuation in determining the value of the stock where the corporation is a real estate holding corporation.
Defendants first allege that the buy/sell agreement prohibits the valuation of the stock based on the value of the assets of the corporation. Secondly, they argue that the characterization of an enterprise as a real estate holding company or an operating company is immaterial. They allege that neither should be valued on the basis of the value of their assets. Finally, if all else should fail they maintain that Allied is an operating company and as such valuation of the assets would be improper in setting a value on the stock.
The Court has carefully examined the buy/sell agreement and all of its amendments. The Court can find no language which prohibits the use of appraisals or valuations of the assets of the corporation in determining the value of the *308 stock. The Court is convinced that the heart of the agreement calls for the utilizing of generally acceptable business and accounting principles applicable to businesses such as the business of Allied, consistently applied. The Court is convinced that this language is the prime determinative to the Board of Directors on the issue of valuation.
The Court believes that it was the intent of the parties, as well as the clear mandate of the agreement, that the general principles mentioned above would be controlling. If those general principles require consideration of the value of the assets of the corporation, then that is what the agreement mandates. Likewise, if those general principles do not require consideration of assets in valuing the stock, then that is what the agreement mandates.
The buy/sell agreement on its face neither mandates nor prohibits, by express language, the utilization of the value of the assets of the corporation in determining the value of the stock. The agreement does mandate the utilization of generally acceptable business and accounting principles applicable to businesses such as Allied.
Much has been made by both sides over the intention of the parties to the agreement. However, the Court finds the agreement to be clear and unambiguous in its directives on valuation of the stock. Therefore, the Court and the parties are bound by the clear language of the agreement and the intention of the parties cannot vary the mandate of the agreement.
The general rules for interpreting a contract prior to Act 331 of 1984, which became effective January 1, 1985, are set forth in Soverign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982, 984 (La.1986), as follows:
The general rules which govern the interpretation of other contracts apply in construing a contract of indemnity.... Interpretation of a contract is the determination of the common intent of the parties. See Civil Code arts. 1945, 1949, 1950 and 1956 (1870); Civil Code art. 2045 (1984). 2 When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.... Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.... Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include.... When the parties intend a contract to have a general scope, but particularly describe a specific situation to eliminate doubt, the interpretation of the contract must not restrict its scope to that specific situation.... The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect. Civil Code art. 1903 (1870). 3 Equity is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.
2. In the interests of clarity and conciseness, the language of 1984 La. Acts, No. 331, which revised titles III and IV of Book III of the Civil Code, is used herein whenever the modern version makes no change in the law.
3. In the 1984 revision of the obligations articles, the substance of article 1903 was enlarged and reproduced in new article 2053 and converted from substantive law to an interpretative rule by Civil Code art. 2054 (1984).
Civil Code art. 2053 (1984) provides:
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contracts, and of other contracts of a like nature between the same parties.
Civil Code art. 2054 (1984) provides:
When the parties made no provision for a particular situation, it must be *309 assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
Whether a contract is ambiguous or not is a question of law. Cf. Boudreaux v. Verret, 422 So.2d 1167 (La.App. 3rd Cir. 1982); Southern Natural Gas Company v. Pursue Energy, 781 F.2d 1079 (5th Cir. 1986).
We disagree with the trial court's conclusion that the agreement is not ambiguous. The agreement first states that "[t]his determination [fixing the stock value] shall be made on the basis of the Allied financials for the preceding fiscal year." The next sentence states "[i]n making such determination, the Directors will consult with Allied's accountants, and, utilizing generally acceptable business and accounting principles applicable to businesses such as the business of Allied, consistently applied, the Directors shall make the determination required by this Subparagraph[.]" This language is ambiguous, and the trial court erred as a matter of law in determining otherwise.
In Kuswa & Associates, Inc. v. Thibaut Construction Co., Inc., 463 So.2d 1264, 1266 (La.1985), appears the following:
In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties.... Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. [Footnote omitted.]
There is extensive evidence in the record concerning what the parties intended to mean by the phrase "generally acceptable business and accounting principles applicable to businesses such as the business of Allied, consistently applied". Louis Gueniot, Jr., James E. Gueydan, Randolph Bazet, Elward T. Brady, James Buquet, Jr., Wilmore Whitmore and Hainke Trapp, all experienced businessmen and former members of Allied's Board of Directors, testified that generally acceptable business and accounting principles required them to exclude appraisals in the stock valuation. Otherwise, Allied would be forced to liquidate and cease operations upon redeeming a large number of shares, such as in the instant case.
Keith L. Voight, a partner in the accounting firm employed by Allied, testified that using appraisals in financial statements would not be proper in Allied's situation. Robert Perez, a tax accountant for Allied, agreed that there are "no hard and fast rules" regarding the use of appraisals in financial statements.
Plaintiffs introduced accounting experts who testified that they would classify Allied as a "real estate holding company" and therefore use appraised value in determining the value of Allied's stock. However, these experts also admitted that using appraised value for buildings and equipment subject to a capitalized lease on a balance sheet would be contrary to generally accepted accounting principles.
Dr. Ray Cinnater, an Allied shareholder, explained the intent of the shareholders in making the new buy-sell agreement as follows:
Q Do you recall anything that occurred after the amendment of this buy-sell agreement in 1973?
A The buy and sell agreement in 1973 if you voluntarily retired included an appraisal, which was different than in 1969. Shortly thereafter this agreement which was signed several of the partners resigned from the partnership, which included Dr. Theriot, Dr. Palomeque, Dr. Graffagnino, Dr. Richard Landry, Dr. Curtis Duplechain who was from Thibodaux, and I think Dr. Ted Gros retired.
Q Were the remaining shareholders of Allied pleased with these resignations and stock sales?
A No, Ma'am, not by any means.
Q Could you explain why you say that?
A Because we basically felt at that time that Dr. Theriot and the other members who got out kind of set us up or the remaining partners felt like as if we got raked over the coals.
*310 Q Was there any attempt by the shareholders and the doctors to change things after this?
A Yes.
Q What did you do?
A Because of these individuals leaving, which was approximately six, it put a great strain on the financial aspect of the corporation, where the corporation did not have basically the money to pay them off. At this same time one of the companies that we had, which was Allied Equipment Company, was also having a great financial burden. This was set up to buy the equipment in the partnership. Over several years we bought equipment. We never increased the payment to the equipment company. Sometime in '71-'72 we started leasing cars and buying cars through the equipment company, which was basically how it was set up that it was a negative cash flow to the corporation. We bought a large amount of equipment, for example, the cobaltnot the cobalt, the accelerator unit, which was approximately $100,000.00 yet we did not really increase the payment to the bank. So therefore the equipment company was having a great loss and was running a negative cash flow. Because of this Mr. Taylor who was our business manager would transfer one money from one account to the other to cover the interest of Allied Equipment Company. Because of these different factors, and we knew that we were in serious financial troubles, that the doctors and with Mr. Taylor decided to form a new company which is known as Allied Enterprises.
Q What was different about Allie [sic] Enterprises? What was different about Allied Enterprises from the previous companies?
A We decided that we wanted the business to be run by business people, and let the doctors do the doctoring and let the business people run the business.
Q Do you recall whether or not the setup of Allied was ever discussed with the doctors?
A The format of Allied Enterprises was thoroughly discussed with doctors on several occasions in the conference room, in the hallways, in Dave's office, in our office, but this was thoroughly discussed.
Q Do you recall any discussion regarding a buy-sell agreement which would be executed with this new company, Allied Enterprises?
A Yes.
Q Do you recall how the stock was going to be valued in this new company?
A It was felt by the doctors and by the businessmen that the stock would be evaluated by the financials or the profit and loss and a balance sheet of the corporation and not by appraisals. Because the appraisals in 1973 set off a great disturbance within the partnership.
Randolph A. Bazet, Jr., the Executive Vice-President of Allied, described the discussions concerning the formation of the new buy-sell agreement as follows:
[O]ne of the main differences which was discussed was the fact that the buy-sell agreement within Allied Enterprises, Incorporated, would in fact in practice be very different from the buy and sell agreement, which had recently been established in Allied Properties, Incorporated. The Allied Properties, Incorporated, buy-sell agreement, I believe it's the one where we have earlier referenced true value and so forth, had generated horrendous cash-flow problems with several shareholders of Allied Properties, Inc., who have recently left and the remaining shareholders in Allied Properties, Inc., as well as the partners in the Clinic, realized that several more departures such as that would completely bankrupt Allied Properties, Inc., and they may have to sell the entire Clinic facility just to pay their debts and get out from under it. And these shareholders were very much interested in maintaining a going concern. So, one of the things that they learned the hard way with the true value buy-sell agreement in Allied Properties, Inc., was that utilization of appraisals to *311 establish stock transaction values had almost wiped them out financially. They were emphatic in that under the new buy-sell agreement within Allied Enterprises, Incorporated, no stockno appraisal values would be used from the standpoint of using these appraisal values to value stock. They didn't say appraisals would not be obtained by Allied Enterprises, Incorporated. They said that no appraisals would be used from the standpoint of valuating the stock. And this was a major point and probably the major difference between the old buy-sell agreement from Allied Properties, Incorporated, and the new buy-sell agreement in Allied Properties, Inc.
George Arceneaux, Jr., the attorney who prepared the new buy-sell agreement for Allied, described the intent of the shareholders as follows:
The Allied Enterprises buy and sell directed the directors, told the directors, to take the profit and loss and the financial statements prepared by the company's accountants based on that using good business practices and accounting principles consistently applied to determine what the value of the stock is but nevertheless it's never to be less than a dollar. Now I think if you had to pinpoint one basic departurewell two really. Number one, those directors were given tremendous discretion in using their business judgment in determining the value of the stock. And secondly and I guess this was the most major one, you were no longer tied to an appraised value determined by either a panel of three people or by Max Derbies or by a periodic appraisal. I think that was the basic difference. That was kind of a compromise I would say between my feeling that they ought to be freely trading their stock and some of the other doctors feelings that nobody ought to have the right to sell their stock at all unless they died. And because it represented an opportunity for these directors, who I think everybody trusted, to use their good business judgment in saying what the stock ought to be but yet there was a floor beneath which the value of that stock couldn't fall. So no doctor if he put up a dollars worth of value, would ever fail to get a dollars worth of value back.
David P. Taylor, Jr., the manager of Allied, and several former directors gave identical testimony. It was their opinion that the shareholders hired them to make Allied a "going concern" or an "operating company", rather than one which merely held real estate.
James E. Gueydan and David P. Taylor, Jr. both testified that the shareholders knew that appraisals would only be used in valuing the stock if and when Allied ceased operation and liquidated its assets.
This evidence demonstrates that it was the intent of the parties that the annual stock price fixings under the buy-sell agreement were not intended to reflect a liquidation valuation which used the appraisal of capital assets, but were designed to buy out the stockholder, more or less, on the basis of his investment in the operating enterprise. The factual holding of the trial court to the contrary is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
When a contract is ambiguous, it may be explained by referring to other contracts on the same subject matter between the same parties before the agreement in question. La.C.C. art. 1949 (1870). The 1973 buy-sell agreement specifically provided for the use of the appraised value of Allied's capital assets in determining the annual stock price fixing for the buy-sell agreement. This requirement was excluded from the 1974 buy-sell agreement here in question.
When a contract is ambiguous, it may be interpreted by considering the manner in which the parties themselves executed it. La.C.C. art. 1956 (1870). From 1974 until the time the plaintiffs herein sought to sell their stock back to Allied, twelve stockholders sold their stock to the corporation at $1.00 per share. Defendants' exhibit A-65 shows the following:

*312
 ALLIED ENTERPRISES, INC.
 STOCK REDEMPTIONS
 1976-1982
 REDEMPTION
 STOCKHOLDER TRANSACTION DATE NO. OF SHARES PRICE
Mr. W. Lintott 2/25/76 2,550 $ 2,550
Dr. M. Thomas 2/27/76 33,885 33,885
Dr. J. Steigner 1/7/77 33,885 33,885
Dr. C. Spence 1/15/77 33,885 33,885
Dr. F. Mathieu 1/18/77 35,398 35,398
Dr. L. Hedge 1/12/79 1,000 1,000
Dr. D. Blythe 1/15/81 1,000 1,000
Dr. P. Rhymes 1/15/81 6,000 6,000
Mr. R. Torbert 1/15/81 670 670
Dr. C. Collins 1/20/82 33,885 33,885
Mr. H. Trapp 1/20/82 2,000 2,000
Mr. E. Brady, Jr. 1/20/82 2,000 2,000

Dr. Aycock acquired his 45,559 shares of stock prior to 1974 for a total cash investment of $23,906.74; Dr. Herques acquired his 33,885 shares of stock prior to 1974 for a total cash investment of $13,016.94.[7] The trial court fixed the purchase price of the stock of Drs. Aycock and Herques based on a 1981 appraised value of $5,522,403 for the capital assets; the capital assets of Allied were liquidated in 1984 for approximately $3.8 million.
For the foregoing reasons, we conclude it was the intent of the parties to the buy-sell agreement that the value of the capital assets of the corporation would not be used to fix the buy-back value of corporation stock.
These assignments of error have merit.

*313 ALLIED'S RECONVENTIONAL DEMAND

(Assignment of Error Number 2)
Allied contends the trial court erred in rendering judgment against it on its reconventional demand for specific performance requiring Drs. Aycock and Herques to tender their stock for the contract price of $1.00 per share.
The buy-sell agreement provides, in pertinent part, as follows:
NOW, THEREFORE, for and in consideration of the mutual agreements and convenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, it is mutually agreed and convenanted by, among and between Allied and the undersigned shareholders, joined by the respective spouses of the said shareholders as intervenors, as follows, to-wit:

I.
Should any shareholder cease to continue in his capacity as hereinabove set forth (that is, as a partner in the Clinic, an employee in a management capacity of the Clinic, or of Allied, a member of the Board of Directors of Allied, or an official advisor or consultant of Allied) by virtue of termination, retirement (voluntary or involuntary), expulsion, death, or for any other reason whatsoever, Allied shall have the sole and exclusive right to purchase and Allied hereby agrees to purchase, and the shareholder (or his spouse, heirs, successors or assigns, as the case may be) does agree to sell, all of the shares of stock of Allied owned by him, at the time, at the price determined pursuant to Article IV hereof, and on the terms and conditions hereinafter set forth.
La.C.C. art. 2462 provides, in pertinent part, as follows:
A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, ... so far amounts to a sale, as to give either party the right to enforce specific performance of same.
The trial court erred in not granting Allied's reconventional demand.
This assignment of error has merit.

PURCHASE OF ADDITIONAL SHARES OF STOCK

(Assignment of Error Number 13)
Allied contends the trial court "erred in holding that plaintiff, Aycock, was entitled to an additional 10,000 shares of stock in Allied Enterprises, Inc., a claim which should not have been allowed both because it is unfounded and because it went beyond the pleadings of this case over the objections of the Appellant." Because we grant Allied's reconventional demand, we need not address this assignment of error. Dr. Aycock never paid Allied the purchase price of $10,000 for these additional shares; therefore, we omit this amount from what Allied must pay Dr. Aycock for the redemption of these additional shares, which is also $10,000.
This assignment of error is without merit.

COURT COSTS

(Assignment of Error Number 15)
Allied contends the district court "erred in taxing all costs, including expert fees, to appellant."
We agree. Plaintiffs are cast for all costs. La.C.C.P. art. 1920.
This assignment of error has merit.

DECREE
For the foregoing reasons, the judgment of the trial court which rejected Allied's reconventional demand is reversed, and judgment is rendered in favor of Allied granting specific performance and ordering Drs. Aycock and Herques, and their spouses, to convey their Allied stock to Allied for purchase prices of $45,559 and $33,885, respectively, with legal interest thereon from date of judicial demand until paid. The judgments of the trial court in favor of the *314 appellees and against Allied on the appellees' petitions are reversed, and those actions are dismissed with prejudice. The appellees are cast for all costs of these proceedings.
REVERSED AND RENDERED.
NOTES
[1] Mary Folse Aycock and Mrs. Anthony Herques also joined in the suits as plaintiffs due to their community property interest in the stock.
[2] The judgment was also in favor of Mrs. Aycock, but not Mrs. Herques. The record does not reflect why Mrs. Aycock was not included in the judgment.
[3] This amount was based on Dr. Aycock's owning 55,559 shares, and subtracting the sum of $10,000 which he owed Allied as the purchase price on the additional shares.
[4] This same group of doctors formed a partnership called the Houma Medical and Surgical Clinic, which engaged in the joint practice of medicine and leased the building from Allied Properties, Inc.
[5] The merger was officially approved by the shareholders at the Houma Medical and Surgical Clinic Partnership meeting of November 27, 1974.
[6] The directors made defendants were James E. Gueydan, Dr. Ray Cinnater, James Buquet, Jr., Louis Gueniot, Jr. and Sidney H. Warren. The trial court dismissed plaintiffs' demands against the directors individually. Plaintiffs have not appealed this portion of the judgment, which is now final.
[7] Exhibit A-63, which detailed how each plaintiff acquired his shares, reads as follows:

 DR. GARLAND P. AYCOCK, JR.
--------------------------------------------------------------------------------------------------
 ALLIED PROP. THE APOTHECARY ALLIED EQUIP. CREDIT ADJ. (direct investment)
 INC. INC. CO. INC. A. E. I., INC.
--------------------------------------------------------------------------------------------------
CAPITAL INVESTED $9,062.74 $1,070.00 $2,674.00 $100.00 $11,000.00
NUMBER OF
SHARES 35 shares 50 shares (partnership) 100 shares 11,000 shares
RECEIVED
A. E. I., INC.
SHARES RECEIVED 28,665 2,550 2,674 670
UPON MERGER shares shares shares shares --
TOTAL CASH INVESTMENT = $23,906.74
TOTAL ALLIED ENTERPRISES, INC. SHARES HELD = 45,559
 DR. ANTHONY J. HERQUES
-----------------------------------------------------------------------------------------------------
 ALLIED PROP. THE APOTHECARY ALLIED EQUIP. CREDIT ADJ. (direct investment)
 INC. INC. CO. INC. A. E. I.,
-----------------------------------------------------------------------------------------------------
CAPITAL INVESTED $9,603.79 $1,623.50 $689.65 $100.00 $1,000.00
NUMBER OF
SHARES 35 shares 50 shares (partnership) 100 shares 1,000 shares
RECEIVED
A. E. I., INC.
SHARES RECEIVED 28,665 2,550 1,000 670
UPON MERGER shares shares shares shares --
TOTAL CASH INVESTMENT = $13,016.94
TOTAL ALLIED ENTERPRISES, INC. SHARES HELD = 33,885