LANIER, Judge.
These are consolidated suits in contract by two former members[1] of a medical partnership seeking judicial interpretation of the partnership agreement as it pertains to the compensation of partners when they withdraw from the partnership. Specifically, it was alleged the two former partners were not properly paid their proportionate share of the partnership’s undistributed income and were not properly paid their contractual termination payment.[2] The partnership answered and asserted the withdrawing partners were properly paid in accordance with the partnership agreement. The partnership reconvened against the withdrawing partners seeking reimbursement for overpayments and for their proportionate shares of long-term obligations incurred during their partnership membership. The trial court held that, pursuant to the partnership agreement, the withdrawing partners were not entitled to a share of the undistributed partnership income (accounts receivable) but were entitled to additional termination payments of $12,000 and $18,513, respectively. The trial court’s reasons for judgment and judgment did not specifically address the reconventional demands, and it is presumed that they were dismissed.[3] The partnership took this de- r volutive appeal. The withdrawing partners answered the appeal asserting their awards were inadequate and should be raised.
FACTS
Houma Medical and Surgical Clinic (Clinic) was a partnership formed in 1968 by several doctors for the joint practice of medicine. Dr. Garland P. Aycock, Jr. joined the Clinic in 1971, and Dr. Anthony J. Herques joined the Clinic in 1973.
*1121 In November of 1981, Drs. Aycock and Herques gave the Clinic their notice of voluntary withdrawal from the Clinic to be effective at the end of February of 1982. The partnership agreement provided for the withdrawal of partners, in pertinent part, as follows:
RETIREMENT AND EXPULSION
[[Image here]]
B. Interest of retiring partners, upon the withdrawal, (voluntary or involuntary, including death) of any member of the partnership, he shall sell, assign and transfer to the remaining partners all rights, title and interest in the partnership and its property and assets for the following consideration, to-wit:
(1) A member, whether voluntarily or involuntarily withdrawing, shall receive:
(a) The amount of his capital account (if there is such), computed on a cash basis, payable in a lump sum or not more than 24 equal monthly installments, at the sole option of the partnership.
(b) His share of the undistributed net income computed on a cash basis of his department for the month in which he retires, such amount to be pro-rated on the basis of the number of days he was actively engaged in the departmental practice in that month. (For example, a member withdrawing in the middle of the month would be entitled to 15/30ths of his share of the net cash income due his department for that month.) The amount determined by this formula is to be paid in full at the end of the month in which he withdraws.
(c) His share in the same proportion as stated above of any other undistributed income computed on a cash basis (such as, illustratively, but not exclusively, income from laboratory, physical therapy, reserve accounts, etc.) to which he may be entitled for that period, and,
(d) He is to be paid a partnership termination payment equal to his average monthly income for the entire time he has been a partner, multiplied times a factor listed below corresponding to the length of time he has been a full member of the partnership:
Length Of Service Service
In Years Multiplier
0-1 0.25
1-2 0.50
2-3 0.75
3-4 1.00
4-5 ' 1.25
5-6 1.50
6-7 1.75
7-8 2.00
8-9 2.25
9-10 2.50
10-11 2.75
11-12 3.00
12-13 3.25
13-14 3.50
14-15 3.75
15-16 4.00
16-17 4.25
17-18 4.50
18-19 4.75
19-20 5.00
20-21 5.25
21-22 5.50
22-23 5.75
23-24 6.00
24-25 6.25
25 & Greater 6.50
(For Example: Partner A retires or withdraws with 8½ years as a partner. During that 8½ years, the partnership has paid him a total of $510,000.00. His average monthly income is, for purpose of this sub-paragraph, $5,000.00-i.e. 8.5 years times 12 = 102 months; $510,000.00 — [sic] 102 = $5,000.00 Doctor A would be entitled to a termination payment of 2.25 (the service multiplier derived from the table set forth above) multiplied by $5,000.00 or $11,250.00. The partnership shall have the sole option to make payments due under this Section B - (1) - (d) in a lump sum or in equal monthly installments over a period not to exceed thirty six (36) months).
(2) A member withdrawing to retire entirely from professional practice because of old age, disability, or death, shall have the same allowances as heretofore stated in sub-paragraphs, (a), (b), (c), and (d);
On June 18, 1982, Dr. Aycock received a letter from the Clinic explaining the calculation of his termination pay, in pertinent part, as follows:
*1122 Attached are several schedules showing the calculations of the partnership termination payment for your professional corporation as prescribed in the section entitled Retirement and Expulsion, page 10 and 11, of the Houma Medical and Surgical Clinic partnership agreement dated January 1st, 1976, an extract copy of which section is attached for your reference. Paragraph B of that section specifically refers to the interest of a partner who is retiring on either a voluntary or involuntary basis.
The attached Schedule I shows a reconciliation of the cash capital account for your corporation referred to in paragraph B-l-(a) as determined by our auditors on December 31st, 1981, the close of the fiscal year of the partnership.
This value shows to be a negative of $18,513.75 due to the fact that the Clinic, on a budgeted cash distribution system, distributed more cash to the partners than was actually realized in profit through this date.
This procedure of fixing the cash distribution to the partners during the year while the profit fluctuates up and down normally doesn’t create any problems because periodically the cash distribution and the profit figures balance on a cumulative basis. A problem is created, however, if a partner leaves the partnership at a time when the profit is overdrawn. In this case, the profit earned by the partner withdrawing and the cash withdrawn by that partner must be reconciled for that partner at the time of withdrawal.
[[Image here]]
Schedule III shows the partnership termination payment for your corporation which was calculated in accordance with the procedure specified in the Retirement and Expulsion Section of the Partnership Agreement under paragraph B-l-(d).
This calculation was made on the basis of income paid for one hundred and twenty-two (122) consecutive months as a partner and the applicable ‘service multiplier’ for the same period. This represents another financial concession by the partnership in favor of your corporation, since, as you are aware, our records reflect that both your corporation and the corporation of Aycock and Blythe, of which you were an employee, were technically on independent contractor status during a portion of that ten (10) year period and, of course, not technically entitled to credit for ‘service multiplier’ during that period. The partnership is pleased to make this concession to you on the basis that you and/or your corporation were considered to be partners ‘in spirit’ throughout the consecutive one hundred and twenty-two (122) month period even though you elected independent contractor status during certain periods for purposes of your own business planning.
Schedule III shows a termination payment due of $29,970.08 on the basis of these calculations.
Schedule IV shows the amounts reflected on our books as received from your corporation for ‘working capital reserve’ during 1981 and January, 1982. You will note that the amount of $7,823.00 collected from your corporation in 1981 was paid on January 5th, 1982, and the amount of $1,522.00 collected in 1982 was paid on February 26th, 1982. Copies of these checks are attached for your review.
Schedule V shows the amounts reflected on our books as owed to Clinic by your corporation for hospitalization and life insurance premiums for employees of your corporation through the end of February, 1982. These amounts were withheld [sic] from our check to your corporation dated February 15th, 1982, a copy of which is attached.
The Summary Schedule, of course, shows the net amount of payment due your corporation under the terms of the Retirement and Expulsion Section of the Partnership Agreement. The Executive Committee has unanimously approved the payment of these funds to your corporation in thirty-six (36) monthly installments, but have agreed to make those installments retroactive to April 1st, 1982. We, therefore, are enclosing our check in the amount of $954.69 for the first three (3) installments and will pay the sum of $318.23 no later than the tenth of each month for the next thirty-two (32) consecutive months and one final installment of $318.28 on the thirty-sixth (36) month.
The completion of these payments will complete our financial obligations to your corporation in accordance with the Retirement and Expulsion Section of the Partnership Agreement.
*1123 Dr. Herques received an identical letter, dollar amounts. The summary schedules with the only difference being the actual for each doctor were as follows:
[[Image here]]
NOTE: Executive Committee has agreed to pay the total amount due of $11,456.33 in thirty-five (35) installments of $318.23 retroactive to April 1st, 1982, and one (1) final installment of $318.28.
[[Image here]]
NOTE: Executive Committee has agreed to pay the total amount due of $3,664.70 in thirty-five (35) installments of $101.79 retroactive to April 1st, 1982, and one (1) final installment of $102.05.
*1124 OFFSET OF OVERPAYMENT ON MONTHLY DRAW AGAINST TERMINATION PAYMENT
(Clinic’s Assignment of Error Number 1)
The Clinic contends the trial court committed error by refusing to allow it to offset each doctor’s deficit in his capital account[4] against his contractual termination payment. The Clinic argues as follows:
The redemption payments due by the Clinic to the Appellees under the Agreement and the debts due by the Appellees to the Clinic as a result of their overdraws of profit shares are subject to offset by operation of law. Alternatively, the Clinic is entitled to reclaim the overpayments under the doctrine of the ‘payment of a thing not due.’ The Partnership Agreement addresses what the Partnership will pay a withdrawing partner in consideration for his interest in the Partnership. It does not absolve a withdrawing partner for monies he himself owes to the Partnership by virtue of cash distributions in excess of the amounts to which he was entitled.
[Footnotes omitted.]
Drs. Aycock and Herques contend the trial court was correct with the following argument:
The Agreement, marked for identification as exhibit ‘P-2’ contains no language allowing the Clinic to offset alleged over-payments from the payouts provided under Paragraph B. As noted by the trial court, the payouts were designed to compensate departing partners for their transfer of their interests in the partner-
ship.... Had the parties contemplated that there would be offsets based on alleged negative capital accounts, the language could have been included in the Agreement.
The trial court judge resolved this dispute with the following rationale:
However, the agreement merely provides for payment to withdrawing partners; it says nothing about payment from a partner to the partnership. The Court is satisfied that the agreement is clear and unambiguous and does not contemplate any setoff or payment by the parties to the partnership. Since the partnership is to retain the ongoing accounts receivable and other assets, it is entirely logical that they also obligate themselves for the ongoing debts of the partnership. Indeed the agreement may fail for want of consideration if the agreement did require the retiring partner to be liable for debts of the partnership but required them to relinquish their rights to partnership assets.
Therefore, the Court has concluded that the defendant should not have deducted the deficit capital accounts from plaintiffs’ payouts under the partnership agreement.
The partnership agreement provides that a person who voluntarily withdraws from the partnership shall receive the amount of his capital account computed on a cash basis, payable in a lump sum, or not more than 24 equal monthly installments, at the sole .option of the partnership. This contract provision is obviously intended to *1125 apply when there are sums due by the partnership to a withdrawing partner in his capital account. This contract provision is clearly not intended to apply to the situation where there has been an overpayment by the partnership to the withdrawing partner in his capital account. In the absence of a contractual provision pertaining to this latter situation, the general law is controlling. La.C.C. art. 2301 provides as follows:
He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore if to him from whom he has unduly received it.
Thus, the withdrawing partners are obligated to the partnership for the over-payments made to them out of their capital accounts.
La.C.C. art. 1893[5] provides, in pertinent part, as follows:
Compensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due.
In such a case, compensation extinguishes both obligations to the extent of the lesser amount.
Thus, since the partnership was obligated to the withdrawing partners for contractual termination payments and the withdrawing partners were obligated to the partnership for overpayments in their capital accounts, compensation took place by operation of law and the contractual termination payments were extinguished to the extent of the overpayments in the capital accounts. The trial court’s holding to the contrary is wrong.
This assignment of error has merit.
THE CLINIC’S RECONVENTIONAL DEMAND
(Clinic’s Assignment of Error Number 2)
The Clinic contends the trial court erred in failing to grant the part[6] of its reconventional demand claiming additional setoffs for overpayments from the capital accounts which occurred from December 31, 1981, to February 28, 1982.
We disagree. The letters of June 18, 1982, from the Clinic to the plaintiffs read, in pertinent part, as follows:
The Clinic Controller has also computed the balance of the cash capital account for your corporation through the dates of November 30,1981, the approximate date of resignation; February 28, 1982, the last day of association with the partnership, and both of these values were less favorable to your corporation. The decision was therefore made to carry your corporation as a partner on the partnership books until December 31st, 1981, after which time the corporation would be treated as an independent contractor for the remainder of its association with the Clinic, since this treatment produced the most favorable financial results for your corporation.
Schedule II shows the value of cash allocated for distribution to your corporation for the period of January 1st, 1982 through February 28th, 1982, the final two months of association of your corporation with the partnership. These values were calculated in accordance with the income distribution formula utilized for all partners for that period, however, as explained earlier, we will show all three (3) of these payments on our books as a payment to an independent contractor during that period. In this manner, your corporation has been voluntarily relieved from any liability of the overdraw of profits which occurred during that two month period, although technically, your corporation was still a voting member of the partnership during that period.
These payments, which were made to your corporation on the dates shown on Schedule II, satisfy the requirements of paragraph B-l-(b) and B-l-(c) of the Retirement and Expulsion Section of the Partnership Agreement. A copy of our checks verifying these payments are also *1126 attached for your reference.
[Bolding added.]
La.C.C. art. 1888[7] provides as follows:
A remission of debt by an obligee extinguishes the obligation. That remission may be express or tacit.
La.C.C. art. 1890[8] provides as follows:
A remission of debt is effective when the obligor receives the communication from the obligee. Acceptance of a remission is always presumed unless the obligor rejects the remission within a reasonable time.
These letters from the Clinic constitute a remission of any additional debts resulting from overpayment after December 31, 1981.
This assignment of error is without merit.
ACCOUNTS RECEIVABLE
(Plaintiffs’ Assignment of Error)
Drs. Aycock and Herques contend the trial court erred in failing to award them a proportionate share of the accounts receivable of the Clinic.
In his Reasons for Judgment, the trial judge stated, in pertinent part, as follows:
Plaintiffs’ first complaint is that they are entitled to receive a share of the partnership’s outstanding accounts receivable. However, the partnership agreement clearly states that the partners will transfer all of their right, title and interest in the partnership and its property and assets in exchange for the payment described. Since the accounts receivable is an asset or property of the partnership, the agreement clearly requires them to remain with the partnership.
The Court is convinced that plaintiffs by signing the agreement clearly gave up their right to a share of the accounts receivable when they left the partnership.
We agree with the trial court that plaintiffs are not entitled to a share of the Clinic’s accounts receivable under the agreement.
This assignment of error is without merit.
ASSESSMENT OF COSTS
(Clinic’s Assignment of Error Number 3)
The trial court assessed all costs against the Clinic. The Clinic contends this was error.
We have reversed the trial court and have dismissed the main demand and have affirmed the dismissal of the reconventional demand. In this posture, all costs attributable to these actions shall be divided equally between the parties. La.C.C.P. art. 1920; Young Oil Company of Louisiana, Inc. v. Durbin, 412 So.2d 620 (La.App. 2nd Cir.1982).
DECREE
For the foregoing reasons, the judgments of the trial court on the main demands in favor of Drs. Herques and Ay-cock and against the Clinic are reversed, and the petitions of the plaintiffs are dismissed with prejudice. The judgments of the trial court against the Clinic on its reconventional demands are affirmed. All costs attributable to these actions are assessed 50% to Drs. Herques and Aycock and 50% to the Clinic.[9]
REVERSED AND RENDERED IN PART; AFFIRMED IN PART.

.The medical corporations of the two plaintiffs were also made parties plaintiff.

.The plaintiffs also sought damages for mental anguish and attorney fees.

.Gremillion v. Rapides Parish Police Jury, 430 *1121 So.2d 1362 (La.App. 3rd Cir.), writs denied, 435 So.2d 426 and 440 (La.1983). Cf. Hendrix v. Hendrix, 457 So.2d 815 (La.App. 1st Cir.1984).

. The operation of each doctor’s capital account is described in the Clinic’s appellate brief as follows:
The negative amounts reflected in the Ap-pellees’ cash capital accounts represent over-distributions of profits to the Appellees. The Clinic adopted a budgeted distribution formula for profit distribution which would steady the monthly ‘draw’ a physician could expect to receive so that he could budget his own lifestyle and personal expenses irrespective of wide monthly fluctuations in Clinic income and expenses. Under the budgeted distribution formula, a doctor's annual charges were projected, an overhead percentage was subtracted from such charges and the resulting figure was divided by twelve to reflect twelve monthly payments. A check would be issued to the doctor each month for a three month period based upon projected income from historical data. At the end of each three month period, actual expenses and income were reviewed and the projection for the next three months of payment would be adjusted, correcting for any inequities that occurred in the prior three months by debiting or crediting the doctor’s cash capital account. If a doctor left the Clinic with a positive figure in his cash capital account, he was entitled to such amount. If a doctor left the Clinic with a negative figure in his cash capital account, the doctor’s debt to the Clinic was deducted from the payments due the doctor in redemption of his partnership interest. [Footnotes omitted.]

. Although this article was enacted by the 1984 La. Acts, No. 331, which revised Titles III and IV of Book III of the Civil Code, its enactment made no change in the prior law.

. The Clinic does not assign as error the failure of the trial court to grant the part of its reconventional demands which sought payment by the withdrawing partners of their proportionate shares of long-term obligations incurred during their partnership membership.

. See footnote 5.

. See footnote 5.

.These actions were consolidated for purposes of trial with two other actions in which the plaintiffs herein were cast for all costs.