611 So.2d 645 (1992)
HAWTHORN, WAYMOUTH & CARROLL
v.
Larry G. JOHNSON.
No. CA 91 1098.
Court of Appeal of Louisiana, First Circuit.
July 29, 1992.
Rehearing Denied January 11, 1993.
*646 John Dale Powers, Jose Ramanach, Baton Rouge, for plaintiff-appellant Hawthorn, Waymouth & Carroll.
Floyd J. Falcon, Jr., Baton Rouge, for defendant-appellee Larry G. Johnson.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
This action commenced as a suit in contract for an accounting by a partnership against a withdrawing partner. The partnership (Hawthorn, Waymouth & Carroll [HWC]) asserted the withdrawing partner, Larry G. Johnson, was indebted to it for $38,743.25, which sum represented $2,735 *647 for partnership equipment retained by Johnson, $106.16 for a health insurance premium advanced on Johnson's behalf, a $36,938.04 overdraft on Johnson's partnership drawing account, and $1,000 for an interest payment made by the partnership for Johnson's personal guaranty for the obligations of a computer company, subject to a credit of $2,035.95 for the book value of Johnson's interest in the partnership. Johnson answered and filed a reconventional demand asserting the partnership was indebted to him for $92,468, which sum represented the value of his interest in the partnership of $129,406, subject to a credit for the deficit in his partnership drawing account of $36,938. At the trial, the parties stipulated that Johnson repaid the $106.16 advance for a health insurance premium. The trial court ruled that HWC was entitled to recover the $1,000 interest payment claim and specifically rejected HWC's claim for the overdraft on the partnership drawing account. The trial court judgment was silent on the claim for the value ($2,735) of the equipment retained by Johnson. Silence in a judgment as to any part of a demand is construed as a rejection of that part of the claim. Sun Finance Company, Inc. v. Jackson, 525 So.2d 532 (La. 1988); Erich Sternberg Realty Company, Inc. v. Louisiana Tax Commission, 560 So.2d 868 (La.App. 1st Cir.), writ denied, 567 So.2d 107 (La.1990). The trial court also held that pursuant to the partnership contract, Johnson was entitled to the book value (capital account balance) of his partnership interest which had a stipulated value of $2,035.95. The trial court offset the claims of the parties and rendered judgment in favor of Johnson and against HWC for $1,035.95, with legal interest thereon from date of judicial demand until paid, and ordered the parties to pay their own costs. HWC took this devolutive appeal.[1] Johnson answered the appeal asserting the trial court judgment "is erroneous to the extent that it rejected defendant-appellant's Reconventional Demand for $92,468.00" and prayed that "he be awarded his full Reconventional Demand" ... "by increasing the amount allowed appellee from $1,035.95 to $92,468.00 with legal interest thereon from date of judicial demand until paid and that appellant be condemned to pay the costs incurred in both Courts and that as thus amended, that said judgment be affirmed."

FACTS
HWC is a partnership engaged in the practice of public accounting and in any other activities incident to such practice. HWC has its principal office in Baton Rouge, Louisiana.
At the trial the parties stipulated to the following facts:
2. Larry G. Johnson's partnership interest was 5.6554%.
3. Larry G. Johnson repaid the $106.16 June, 1986 advance for health insurance premium.
4. Larry G. Johnson capital account balance (book value) as of May 31, 1986 was $2,035.95.
5. As of May 31, 1986 Hawthorn, Waymouth and Carroll's capital units valuation account (one times annual billing) was $1,977,287.43.
6. Larry G. Johnson was made a partner in July, 1979.
7. Larry G. Johnson withdrew from Hawthorn, Waymouth & Carroll on May 31, 1986.
8. Larry G. Johnson commenced an accounting practice on July 1, 1986 in Baton Rouge, within 75 miles of Hawthorn, Waymouth & Carroll office [sic].
9. Louis McKnight and James Campbell were admitted to partnership in Hawthorn, Waymouth & Carroll on July 1, 1981.
10. Greg Brown was admitted to partnership after McKnight and Campbell and withdrew in 1984.
11. Larry G. Johnson actually paid $20,096.44 for his interest in Hawthorn, Waymouth & Carroll.
13. [sic] The effective date of the Hawthorn, Waymouth & Carroll Partnership *648 Agreement sued upon was November 1, 1980. It was signed April 6, 1981.
The pertinent portions of the partnership contract[2] are as follows:
II. NAME AND TERM
. . . . .
2.2 The partnership shall continue until such time as partners owning 80% of the capital units vote to terminate it notwithstanding the death, withdrawal, retirement or expulsion of any partner. Such death, withdrawal, retirement, or expulsion shall be effective only to terminate the partnership as to that partner as more fully set forth below and the partnership shall continue as to the remaining partners.
. . . . .
VIII. CAPITAL UNITS VALUATION AMOUNT
8.1 The assets of the Firm will not be revalued at admission or retirement of a partner, or upon any other change in the partnership. The books of the Firm are kept on the accrual basis and any error in depreciation of office equipment would represent a negligible amount in the valuation of the assets. The library consists largely of tax services and similar publications which are renewable each year. Work in process is reflected on the books of account as an inventory account, at cost, and any revaluation would therefore represent a guess.
8.2 For the purchase, sale, or donation of capital units and in order to reflect the good will of the Firm, the capital units are fixed in value at one time annual billings. Book value represents and reflects the value of all of the physical assets and accounts receivable of the Firm. Good will represents the additional cost.
8.3 This factor, one times annual billings, is the capital units valuation amount. The sale or purchase of capital units may not be made at any other price unless this is approved by a favorable vote of the partners holding a majority of the capital units.
8.4 The valuation amount may be changed at any time by the partners. Prior to any admission or retirement, the valuation amount must be established by the partners. If they fail to agree on a change by vote of the partners owning a majority of the capital units, the last valuation fixed shall continue to be used.
. . . . .
XII. WITHDRAWAL
12.1 Any partner may terminate his participation in the partnership by giving notice to the remaining partners at least 90 days in advance. If such notice is given, the remaining partners may waive the waiting period and elect for the partnership to terminate immediately or on any intermediate date.
12.2 Should a partner give notice of his desire to terminate his participation in the partnership after having been a member of the partnership, or of the predecessor partnership of Hawthorn, Waymouth & Carroll, for five years, the remaining partners shall have the option either:
a. To purchase his partnership interest based upon the book value of the partnership capital units owned by him at the capital unit valuation amount. The sum thus computed is the price due for the withdrawing partner's interest, or
b. To purchase his interest at the same price but payable over a period of five (5) years in equal monthly installments without interest. The withdrawing partner shall not be employed in the affairs of the partnership during that time and he may engage in his own professional practice should he desire, subject to the limitation imposed by paragraph 12.7. The payment of this sum over the five (5) year period will be payment to the withdrawing partner in full for all of his interest in the partnership and its assets and he *649 shall be entitled to no other or further sum whatever.
12.3 Should a partner give notice of his desire to terminate his participation in the partnership before he has been a member of the partnership for five years, the remaining partners shall have the same options except that the purchase price shall be determined at the book value of the capital units without use of the capital units valuation amount, it being understood that the good will which can inure to a partner who has been a partner for less than five years is negligible.
12.4 If the remaining partners do not elect to purchase the interest of the withdrawing partner in either of the above fashions, the withdrawing partner shall have the option to purchase the capital units of the remaining partners at their value as determined by use of the capital units valuation amount.
12.5 If neither wishes to purchase, then the partnership's affairs shall be liquidated. The assets remaining after liquidation shall be divided among the partners in accordance with their respective capital accounts.
12.6 Should any partner or group of partners purchase the interest of another partner or partners in accordance with this article, either for cash or by payment over a period of five years, the buyer or buyers shall have the privilege of continuing to use the partnership name either permanently or so long as they shall see fit.
12.7 If a partner who has been a member of the partnership for five years elects to withdraw and commences to receive payment for his capital units as set forth in 12.2(a), he shall not engage for a period of five years from the date of his withdrawal in the private practice of accounting within a radius of 75 miles of the office in which he was physically located or domiciled and practiced as a partner. If he wishes to preserve his right to practice, he must elect at the time of withdrawal to receive only the book value of the partnership capital units owned by him in full settlement of his rights in the partnership as stated in 12.2(b).
12.8 Except as expressly provided in the articles of partnership no partner may sell or otherwise dispose of his partnership interest.

ENTITLEMENT OF HWC TO REIMBURSEMENT FOR JOHNSON'S OVERDRAFT ON THE PARTNERSHIP DRAWING ACCOUNT
In its only assignment of error[3] HWC contends the trial court erred in rejecting its demand for reimbursement of the deficit in Johnson's drawing account in the amount of $36,938.04.
Under the partnership agreement a partner was required, at the end of the year, to repay any draws or advances which were in excess of his net earnings. However, the agreement did not specifically address the repayment of advances in excess of earnings upon the withdrawal of a partner. Since the section of the partnership agreement dealing with repayment of shortfalls in a partner's drawing account was not expressly incorporated into the section of the partnership agreement dealing specifically with withdrawal, the trial court held the requirement to reimburse the firm for overdrafts was not intended to apply in cases of withdrawal.
A similar factual situation was addressed by this court in Herques v. Houma Medical & Surgical Clinic, 518 So.2d 1119 (La. App. 1st Cir.1987). In Herques, the partnership sought reimbursement from the withdrawing partners of an amount sufficient to offset a deficit in the withdrawing partners capital accounts. The partnership agreement in Herques, like the agreement between HWC and Johnson, did not contain a provision that dealt with overpayment to a withdrawing partner. This court held in the absence of a specific contractual provision general law controls, and specifically *650 relied on La.C.C. art. 2301 that provides as follows:
He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it.
In sum, this court held the partnership was entitled to recovery under the doctrine of "payment of a thing not due." Therefore, under the holding of Herques, we must conclude the trial court's holding to the contrary is wrong as a matter of law.
This assignment of error has merit.

JOHNSON'S ENTITLEMENT TO THE CAPITAL UNITS VALUATION OF HIS PARTNERSHIP INTEREST ($111,823.51) RATHER THAN THE BOOK VALUE OF IT ($2,035.95)

(Johnson's assignments of error 1, 2 and 3)
Johnson asserts the trial court erred by refusing to award him $111,823.51 for the capital units valuation of his partnership interest. He contends the partnership terminated prior to the date he left because "additional partners were added", the partnership contract was not binding because the partnership was dissolved and, thus, he was entitled to the capital units valuation of his partnership interest. In the alternative, Johnson argues that if the partnership was not dissolved and the partnership contract is controlling, paragraphs 12.2 and 12.7 must be interpreted in reference to each other, the noncompetition clause of paragraph 12.7 is unenforceable pursuant to the public policy expressed in La.R.S. 23:921, and, thus, when the valid portions of paragraph 12.7 are construed with paragraph 12.2, he is entitled to receive the capital unit valuation for his partnership interest. He then specifically asserts the following:
In this case, the partners did not elect to purchase appellee's partnership interest based upon capital unit valuation amount under either option (a) or option (b) but rather, sought to rely on Article 12.7 seeking to kick in the book value penalty. However, 12.7, assuming it is enforceable, imposes a non-competition penalty only on that partner who has withdrawn and who commenced to receive payment for his capital units as set forth in 12.2. The provisions are in hopeless conflict.

Termination of Partnership
The parties stipulated that Johnson became a partner in HWC in 1979. At that time, the causes for termination of a partnership were listed in La.C.C. art. 2876 (1870) which provided as follows:
Art. 2876. Causes for termination
Art. 2876. A partnership ends:
1. By the expiration of the time for which such partnership was entered into.
2. By extinction of the thing, or the consummation of the negotiation.
3. By the death of one of the partners, or by his interdiction.
4. By his bankruptcy.
5. By the will of all the parties, legally expressed, or by the will of any of them, founded on a legal cause, and expressed in the manner directed by law.
In Shalett v. Brownell-Kidd Company, 153 So.2d 425 (La.App. 1st Cir.), writ refused, 244 La. 1004, 156 So.2d 57 (La.1963), this court specifically held that the admission of a new partner did not terminate a partnership because it was not a cause for termination listed in Article 2876. Although the partnership contract herein was given an effective date of November 1, 1980, it was not signed by the partners until April 6, 1981. By Acts 1980, No. 150, effective January 1, 1981, the Louisiana law on partnerships, La.C.C. art. 2801 et seq., was substantially revised. Article 2876 became Article 2826 which provided as follows:
Unless continued as provided by law, a partnership is terminated by: the unanimous consent of its partners; a judgment of termination; the granting of an order for relief to the partnership under Chapter 7 of the Bankruptcy Code; the reduction of its membership to one person; the expiration of its term; or the *651 attainment of, or the impossibility of attainment of the object of the partnership.
A partnership also terminates in accordance with provisions of the contract of partnership.
Article 2826 was amended by Acts 1981, No. 797 to provide as follows:
Unless continued as provided by law, a partnership is terminated by: the unanimous consent of its partners; a judgment of termination; the granting of an order for relief to the partnership under Chapter 7 of the Bankruptcy Code; the reduction of its membership to one person; the expiration of its term; the attainment of, or the impossibility of attainment of the object of the partnership; retirement from the partnership, or the death, interdiction, or dissolution of any general partner unless the partnership is continued by the remaining general partners under a right to do so stated in the contract of partnership or with the consent of all of the remaining partners.

A partnership also terminates in accordance with provisions of the contract of partnership. (Emphasis added)
This amendment partially incorporates the jurisprudential rule that removal of all of the general partners in a partnership in commendam effects an automatic dissolution of the partnership in commendam. Lovell v. Hallelujah, Inc., 451 So.2d 116 (La. App. 3rd Cir.), writ denied, 458 So.2d 484 (La.1984). Act 797 of 1981 also provided as follows:
The provisions of this Act shall apply to all partnerships, including those existing on the effective date of this Act, but no provision may be applied to divest already vested rights or to impair the obligations contracts.
By Acts 1982, No. 273, Article 2826 was again amended to provide as follows:
Art. 2826. Termination of a partnership; causes
Unless continued as provided by law, a partnership is terminated by: the unanimous consent of its partners; a judgment of termination; the granting of an order for relief to the partnership under Chapter 7 of the Bankruptcy Code; the reduction of its membership to one person; the expiration of its term; or the attainment of, or the impossibility of attainment of the object of the partnership.
A partnership also terminates in accordance with provisions of the contract of partnership.
A partnership in commendam, however, terminates by the retirement from the partnership, or the death, interdiction, or dissolution, of the sole or any general partner unless the partnership is continued with the consent of the remaining general partners under a right to do so stated in the contract of partnership or if, within ninety days after such event, all the remaining partners agree in writing to continue the partnership and to the appointment of one or more general partners if necessary or desired. (Footnote omitted)
Addition of a new partner has never been a ground for termination of a partnership in Article 2826 as originally enacted or as amended. The rationale of Shalett still applies and is controlling. Further, Sections III (Partners), and VII (Capital Units Valuation Amount) of the partnership agreement provide for the admission of new partners during the existence of the partnership. Paragraph 2.2 of the partnership agreement provides "The partnership shall continue until such time as partners owning 80% of the capital units vote to terminate it notwithstanding the ... withdrawal... of any partner." These contractual provisions are not against public policy and are binding on the parties to the contract. Johnson's reliance on the Lovell case as authority for the proposition that the addition of new partners after he executed the partnership agreement effected a termination of the partnership is not well founded. In Lovell, the partnership was a partnership in commendam; the partnership in the instant case is an ordinary partnership. In Lovell, all of the general partners were removed; in the instant case, there are no general partners to remove, the partners were added.
This argument is without merit.

*652 Rules for Interpreting Contracts

Contracts have the effect of law on the parties thereto and must be performed in good faith. La.C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties. La.C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La.C.C. art. 2046. Conversely, when the terms of a contract are susceptible to more than one interpretation, it is ambiguous and parol evidence may be used to show the true intent of the parties and various rules of interpretation become applicable. La.C.C. arts. 2045 et seq.; Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087 (La.1981). Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La.C.C. art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La.C.C. art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La.C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation; however, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. La.C.C. art. 2057. See also Carter v. BRMAP, 591 So.2d 1184 (La.App. 1st Cir. 1991). Whether a contract is ambiguous or not is a question of law. Aycock v. Allied Enterprises, Inc., 517 So.2d 303 (La.App. 1st Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988).

Interpretation of the Partnership Contract
The legal relations between the withdrawing partner and the partnership are provided for in Section XII of the partnership contract. In particular, paragraph 12.2 provides that if a withdrawing partner has been a member of the partnership for 5 years, the remaining partners have the option to purchase the withdrawing partner's interest either (a) in a lump sum, or (b) in equal monthly payments over a 5 year period. When HWC filed suit on October 23, 1987, it credited the amount that it contended Johnson was entitled to for his partnership interest in a lump sum ($2,035.95) against the amount it contended was due to it as a deficit balance in Johnson's partnership drawing account ($36,938.04), and claimed $34,902.09 as the "Deficit balance in defendant's drawing account less book value of partnership units." Thus, the remaining partners in HWC chose the option provided for in paragraph 12.2(a); the remaining partners did not choose the 5 year buyout option provided for in paragraph 12.2(b). Johnson's assertion that "HWC elected neither of the only two options available to it" is without merit.
Paragraph 12.2(a) provides that "the remaining partners shall have the option ... To purchase his [the withdrawing partner's] partnership interest based upon the book value of the partnership capital units owned by him at the capital unit valuation amount." (Emphasis added). Pursuant to paragraph 8.2, "Book value represents and reflects the value of all of the physical assets and accounts receivable of the Firm." The book value[4] of Johnson's partnership interest is $2,035.95. Pursuant to paragraphs 8.2 and 8.3, the capital unit valuation amount is "one time annual billings". The capital unit valuation amount for Johnson's partnership interest *653 is $111,823.51 (5.6554% times $1,977,287.43). Pursuant to paragraph 8.2, "Good will represents the additional cost" between book value and the capital unit valuation amount. Johnson contends that paragraph 12.2(a) requires "payment at the capital unit valuation amount". We do not agree. While it must be conceded that paragraph 12.2(a) is not artfully drafted, nevertheless, the phrase "owned by him at the capital unit valuation amount" clearly is intended to modify or describe "partnership capital units"; the phrase is not intended to describe or modify the purchase price of the partnership capital units. The purchase price of the partnership capital units clearly and unambiguously is their book value. Any other interpretation would render the phrase "book value" meaningless as it is used in the context of paragraphs 8.2 and 12.2(a).
Johnson asserts that HWC "sought to rely on Article 12.7 seeking to kick in the book value penalty." He then argues that "Since appellee [Johnson] withdrew, but did not commence to receive payment for his capital unit, then by the terms of 12.7, he was not required to refrain from engaging in the private practice of accounting, because 12.7 clearly states that only that partner who withdrew and commenced to receive payment for his capital units at the capital unit valuation amount is required not to engage in a local accounting practice." The noncompetition provision of the partnership contract is found in paragraph 12.7. The first sentence of paragraph 12.7 specifically provides that if the withdrawing partner "commences to receive payment for his capital units as set forth in 12.2(a) [at book value and in a lump sum], he shall not engage for a period of five years from the date of his withdrawal in the private practice of accounting within a radius of 75 miles of the office in which he was physically located or domiciled and practiced as a partner." This language is clear and unambiguous and should be enforced as written (assuming it is not contrary to public policy). As previously indicated, when HWC filed this suit it, in effect, tendered the book value of Johnson's partnership interest to him in a lump sum (and credited that amount against the deficit in Johnson's partnership drawing account). At that time, Johnson was practicing accounting in Baton Rouge within 75 miles of the HWC office and continued to do so. Thus, Johnson breached this provision of the contract. However, this is not a suit to enjoin Johnson from practicing accounting within 75 miles of Baton Rouge or a suit for damages for breach of the noncompetition clause. Whether or not Johnson practiced within 75 miles of Baton Rouge does not control the purchase price of his partnership interest under the provisions of paragraph 12.2(a). That purchase price is the same whether or not Johnson practiced within 75 miles of Baton Rouge.[5]

Validity of the Noncompetition Clause
Johnson asserts "Article 12.7 of the Partnership Agreement is unenforceable as violative of R.S. 23:921, therefore, appellee's units are to be valued at the capital units valuation amount rather than at book value."
La.R.S. 23:921, prior to its revision by Acts 1989, No. 639, provided as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and *654 bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
(Emphasis added)
Pursuant to La.R.S. 1:3, La.R.S. 23:921 "shall be construed according to the common and approved usage of the language." The statute is clear and unambiguous in its reference only to the employer, the employee and the contract of employment. Pursuant to La.R.S. 1:4 "[W]hen the wording of a Section [of the Revised Statutes] is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." As observed in Simpson v. Kelly Services, Inc., 339 So.2d 490, 494 (La.App. 2nd Cir.1976), writ denied, 341 So.2d 1121 (La.1977), "R.S. 23:921 applies only to persons in employee-employer relationships and will not be extended to other relationships by judicial construction or interpretation."
The employer-employee (employment) contract is a nominate one called a lease of labor and is provided for in La. C.C. arts. 2669, 2673, 2675 and 2746 et seq. Guidry v. Freeman, 555 So.2d 588 (La. App. 1st Cir.1989). A lease of labor is a synallagmatic contract based on mutual consent by which one party (employee) gives to the other (employer) his labor (services) at a fixed price. Philippe v. Lloyd's Aero Boliviano, 589 So.2d 536 (La.App. 1st Cir.1991), writ denied, 590 So.2d 594 (La. 1992).
A contract of partnership is a separate and distinct type of nominate contract from that of a lease of labor. Contracts of partnership are provided for in La.C.C. art. 2801 et seq. Pursuant to La.C.C. art. 2801 "[A] partnership is a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined propositions and to collaborate at mutual risk for their common profit or commercial benefit."
A contract of employment can not be denominated a contract of partnership, unincorporated association or incorporation and avoid the public policy expressed in La.R.S. 23:921. Cust v. Item Co., 200 La. 515, 8 So.2d 361 (1942); Standard-Crescent City Surgical Supplies, Inc., 535 So.2d 1301 (La.App. 5th Cir.1988); Nelson v. Associated Branch Pilots of Port of Lake Charles, 63 So.2d 437 (La.App. 1st Cir.1953). To determine whether a contract is one of employment or creates some other form of legal relationship, various factors must be considered. In Winston v. Bourgeois, Bennett, Thokey and Hickey, 432 So.2d 936, 940 (La.App. 4th Cir.1983) appears the following:
The form of the contract is immaterial as is the label tacked to the individual: employee, associate, partner, independent contractor, or shareholder. Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances under which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
Johnson testified he started working for HWC in 1974 as an employee. As an employee of the partnership, he was not exposed to the risks assumed by the partners, nor did he get the benefits of being a partner. On July 1, 1979, Johnson voluntarily chose to change his legal relationship with HWC from that of employer-employee to that of partnership. In 1981, Johnson voluntarily[6] executed a partnership contract memorializing the legal relationships between the partners. A review of the partnership contract and the facts of this case shows that the contract is not a contract of employment; it is a "garden variety" professional partnership contract and should be enforced as such. Winston v. Bourgeois, Bennett, Thokey and Hickey; McCray v. Blackburn, 236 So.2d 859 (La. App. 3rd Cir.), writ refused, 256 La. 845, *655 239 So.2d 355 (1970). The trial court was not clearly wrong in its factual findings and did not commit legal error. The noncompetition clause is valid and La.R.S. 23:921 is not relevant.

Conclusion
This assignment of error is without merit.

VALIDITY OF HWC'S $1,000 CLAIM

(Johnson's assignment of error 4)
In brief, Johnson assigned error contending "The Trial Court erred in awarding HWC recovery for the computer removed by Johnson." Johnson argued "HWC failed to put on any evidence in support of this claim and therefore abandoned it."
In its petition, HWC asserted a $2,735 claim for "computer equipment removed by defendant" and a $1,000 claim for "advances to defendant on Microage Computer". The evidence showed that the partners in HWC were stockholders in Microage, Inc. (Microage), a computer business. Apparently Microage had a loan from the Capital Bank and Trust Co. (Capital) and the HWC partners gave personal continuing guaranties to Capital to secure the loan. In June of 1986, HWC advanced money to Microage to pay interest on the Capital loan and Johnson's share of the advance was $1,000. In his reasons for judgment, the trial judge stated that "Plaintiff's claim for $1,000.00 for Defendant's share of the computer is valid." The trial court rendered judgment in favor of HWC for this amount. The trial court did not render a judgment in favor of HWC for the $2,735 claim for computer equipment removed by Johnson, and, thus, rejected this claim.
However, whether this assignment of error pertains to computer equipment removed or advances on Johnson's personal guaranty to the computer company, we will not consider it because Johnson did not assert this error in his answer to the appeal. La.C.C.P. art. 2133; Lilly v. Allstate Insurance Company, 577 So.2d 80 (La. App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991).

DECREE
For the foregoing reasons, (1) the judgment of the trial court on the main demand by HWC against Johnson is reversed insofar as it denied HWC's claim for reimbursement for $36,938.04, and judgment is rendered in favor of HWC against Johnson for that amount, and (2) the judgment of the trial court denying Johnson's claim for capital units valuation for his partnership interest in Johnson's reconventional demand against HWC is affirmed, and (3) the judgment of the trial court is amended to render judgment in favor of HWC and against Johnson for $35,902.09[7] with legal interest thereon from date of judicial demand[8] (October 23, 1987) until paid. Johnson is cast for all costs.
REVERSED AND RENDERED IN PART; AFFIRMED IN PART; AMENDED IN PART.
SHORTESS, J., concurs in part and dissents in part with reasons.
CRAIN, J., concurs with reasons.
SHORTESS, Judge, concurring in part and dissenting in part.
This decision fails to grasp its economic consequences. Defendant's interest was valued at $111,823.51, however, he owed $36,938.04 for overdrafts in his capital account. The decision upholds the validity of the non-compete language in the partnership agreement. The net effect is that defendant is penalized $109,787.51 for competing, he must pay his overdrafts, plus he remains obligated to the individual partners *656 for the balance due for his shares, approximately $75,000.00. Something is just not right.
The defendant, a young certified public accountant, began working for the partnership in 1974, and he was admitted as a partner in 1979. Defendant initially purchased 200 of the partnership's 10,000 units. Over the years defendant increased his interest to 5.6554%. Defendant paid $94,789.85 for his interest, $20,096.64 in cash with the remaining amount reflected as a receivable.[1] At the time of purchase, the value of defendant's interest was determined by the capital unit valuation method, multiplying the annual partnership billing by one percent. Based on the capital unit valuation method, the 5.6554% interest is worth $111,823.51. However, defendant's interest was reflected on the partnership's books at book value, which reflects the value of the partnership's assets and accounts receivable. As stipulated by the parties, the value of defendant's interest using book value as a method of determining value is $2,035.95. In order for defendant to practice within 75 miles of plaintiff's office he must forfeit approximately $109,787.51 under the penalty provision in Section 12.7. This figure represents approximately two years of salary defendant received from the firm, $54,000.00 per year. Moreover, plaintiff will apparently sell defendant's units to an incoming partner for substantially the same amount paid by defendant. Thus, the potential exists for individual partners to reap a substantial windfall.
In my opinion it is error to conclude LSA-R.S. 23:921 does not apply to the non-compete agreement. Prior to the major revision that occurred in Acts 1989, No. 639, LSA-R.S. 23:921 provided as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
The record does not reflect plaintiff incurred any expenses training defendant or promoting defendant through advertising.
Louisiana has continuously maintained a strong public policy against employment contracts which prohibit an employee from competing with a former employer. Orkin Exterminating Co. v. Foti, 302 So.2d 593 (La.1974). The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society. Winston v. Bourgeois, Bennett, Thokey, & Hickey, 432 So.2d 936 (La.App. 4th Cir.1983).
Although the statute speaks in terms of employment contracts, the jurisprudence has extended the statute beyond a pure employee/employer relationship, to other legal relationships, including the relationships between partners and partnerships and shareholders and their corporations. Cust v. Item Co., 200 La. 515, 8 So.2d 361 (1942) (interpreting Acts of 1934, No. 133 the predecessor of LSA-R.S. 23:921), rev'd in part by 9 to 5 Fashions v. Spurney, 538 So.2d 228 (La.1989); Nelson v. Associated Branch Pilots, 63 So.2d 437 (La.App. 1st Cir. 1953) (interpreting Acts of 1934, No. 133, the predecessor of LSA-R.S. 23:921); Alexandria Anesthesia Service v. Firmin, 576 So.2d 1237 (La.App. 3d Cir.), writ granted in part with order, 580 So.2d 918 (La.1991), writ denied, 580 So.2d 927 (La. 1991); Standard-Crescent City Surgical Supplies v. Mouton, 535 So.2d 1301 (La. *657 App. 5th Cir.1988); Winston, 432 So.2d at 940. The right of control and direction is one of the most important tests in determining whether one is truly an employee. In Winston, the court set forth the following factors which must be considered when determining whether a particular non-compete agreement is among co-owners or between an employee and employer:
Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances under which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
Winston, 432 So.2d at 940.
The testimony reveals the agreement was not signed by many of the partners admitted to the firm after defendant. For example, Robert Wales testified that Greg Brown, who was admitted to the partnership some time after 1981, was not required to sign the agreement. The parties stipulated Brown left the partnership prior to defendant and opened a practice in Baton Rouge. According to the unrebutted testimony of defendant, who was still a partner when Brown left the partnership, the partnership did not attempt to impose the penalty provision of Section 12.7 on Brown. All partners were not bound equally by the agreement.
Here, the partnership agreement did not adopt a "one man, one vote" method of voting. Instead, each partner's vote was weighted based on the number of units each partner owned. When the partnership agreement with defendant was confected the units of the partnership were divided in the following manner:

 11-1-80 Balance
H. Daniel Carroll 1,717.414
Robert J. Zernott 1,791.461
Warren C. Ber 1,489.495
Robert E. Wales 1,791.461
Carl L. Hancock 1,573.847
Henry O. Gaudet 718.161
J. Charles Parker 718.161
Larry Johnson 200.000

According to the unrebutted testimony, a handful of the older partners formed a voting block to control all of the major decisions facing the partnership.
The younger partners, including defendant, as minority unit holders, were subject to the wishes of a controlling majority. The testimony reveals, among other things, that new partners were told they were admitted to the partnership without any negotiation over the terms; that they were told how many units they could purchase; that they were told how many units must be sold to the incoming partners; that they were told the sale price of the units; that their client list was selected for them; and that they were told how much to bill individual clients.
In sum, I believe defendant was more like an employee than an equal partner. Defendant's vote was not equal to that of his colleagues on essential matters. There is evidence the firm exercised control over defendant's work. A majority exercised control over the destiny of the firm. The non-compete agreement did not apply equally to all partners. And the amount of the stipulated damages clause effectively eliminated defendant's right to engage freely in his chosen profession after leaving the partnership. Cf. Winston, 432 So.2d at 940; McCray v. Blackburn, 236 So.2d 859 (La.App. 3d Cir.), writ denied, 256 La. 845, 239 So.2d 355 (1970).
The trial court in its written reasons for judgment, without discussing any of the factors mentioned above, found the non-compete clause valid. Assuming the court considered the Winston factors in making its determination, based on the evidence in the record, I must conclude the trial court committed manifest error. Therefore, under the facts presented in this case, I would find our long-standing public policy prohibits the enforcement of the non-compete agreement. LSA-R.S. 23:921.
Accordingly, I concur in that part of the decision which awards HWC $36,938.04 on the main demand. I would reverse and *658 grant defendant recovery on his reconventional demand for the reasons stated.
CRAIN, Judge, concurs.
I agree that Hawthorne, Waymouth and Carroll (HWC) should have judgment against Johnson for $35,902.04, but not for the reasons stated by my colleague. In my opinion the withdrawal provision of 12.2(a) clearly calls for capital unit valuation (1 × 1 yr. billings). With Johnson's partnership interest of 5.655 per cent he would be entitled to $111,823.51. However, under 12.7 the penalty for competing contrary to the non-compete clause is withdrawal at book value. If 12.2(a) requires book value the penalty of receiving book value for competing contrary to the non-compete clause in 12.7 is rendered meaningless.
Book value is $2,035.95. That credit along with the others allowed by this court that I agree with has to be deducted from the amount of $36,938.04 which we all agree Johnson owes HWC. Consequently, Johnson still owes HWC $35,902.09.
This is a legitimate partnership agreement. Consequently, the non-compete clause is valid. Johnson is competing. The matter is thus resolved under 12.7 of the agreement.
I concur in the result.
NOTES
[1] HWC obtained an order for a suspensive appeal, but no suspensive appeal bond was filed.
[2] The entire partnership contract is attached to this opinion as unpublished appendix "A".
[3] HWC did not assign error in the trial court ruling that rejected its claim for $2,735 for partnership equipment retained by Johnson, and that judgment is now definitive.
[4] The reason for having a book value or true value provision is explained in Aycock v. Allied Enterprises, Inc., 517 So.2d at 309 wherein this court indicated that a similar buyout provision prevented a forced liquidation if a large interest had to be redeemed.
[5] The second sentence of paragraph 12.7 only applies in situations where paragraph 12.2(b) is applicable.
[6] Johnson has not alleged or proved the vices of consent of fraud, duress or error.
[7] The sum of the claims for $36,938.04 plus $1,000 is $37,938.04, less $2,035.04 for the book value of the partnership interest is $35,902.09.
[8] Although this is an action in contract, HWC only prayed for legal interest from the date of judicial demand. La.C.C.P. art. 1921; Polk Chevrolet, Inc. v. Webb, 572 So.2d 1112 (La.App. 1st Cir.1990), writ denied, 575 So.2d 394 (La. 1991); Johnson v. Southern University, 551 So.2d 1348 (La.App. 1st Cir.1988), writ denied, 553 So.2d 475 (1989); Landry v. Louisiana Hospital Service, 449 So.2d 584 (La.App. 1st Cir. 1984).
[1] Based on the record before us, it appears defendant would owe the remaining partners any unpaid residuum. However, this issue is not properly before us, since the plaintiff in this case is the partnership and not the individual partners.